Fox Rothschild ᴸᴸᴾ

Campbell Mithun Tower
222 South Ninth Street   Suite 2000
Minneapolis, MN 55402-3338
Tel 612 307 7000 Fax 612 307 7100
www.foxrothschild.com

ELIZABETH A. PATTON
Direct No:  612.607.7202
Email: epatton@foxrothschild.com

November 25, 2019

**VIA PERSONAL SERVICE**

LivaNova USA, Inc.
c/o Universal Registered Agents, Inc.
12 Timber Creek Lane
Newark, DE 19711

**Re:**   *Todd J. Mortier, as Member Representative of the former Members of Caisson Interventional, LLC v. LivaNova USA, Inc.*

Dear Sir/Madam:

Pursuant to Minnesota Rule of Civil Procedure 3.01(a), enclosed herein and personally served upon you as Registered Agent for LivaNova USA, Inc., please find the following:

1.   Summons; and

2.   Complaint.

Sincerely,

*Elizabeth Patton*

Elizabeth A. Patton

Enclosures

A Pennsylvania Limited Liability Partnership

California   Colorado   Connecticut   Delaware   District of Columbia   Florida   Illinois
            Nevada    New Jersey   New York   Pennsylvania   Texas   Washington

**Attachment 1**

STATE OF MINNESOTA                                      DISTRICT COURT

COUNTY OF HENNEPIN                            FOURTH JUDICIAL DISTRICT
                                                    CASE TYPE: Contract

Todd J. Mortier, as Member Representative of
the former Members of Caisson Interventional,        Court File No. _____
LLC,

                              Plaintiff,                    **SUMMONS**

        v.

LivaNova USA, Inc.,

                              Defendant.

---

**THIS SUMMONS IS DIRECTED TO THE ABOVE-NAMED DEFENDANT.**

        **1.    YOU ARE BEING SUED**. Plaintiff has started a lawsuit against you.  The
Plaintiff's Complaint against you is attached to this Summons.  Do not throw these papers away.
They are official papers that affect your rights.  You must respond to this lawsuit even though it
may not yet be filed with the Court and there may be no court file number on this summons.

        **2.    YOU MUST REPLY WITHIN 20 DAYS TO PROTECT YOUR
RIGHTS**.   You must give or mail to the person who signed this Summons **a written response**
called an Answer within 20 days of the date on which you received this Summons. You must send
a copy of your Answer to the person who signed this Summons located at:

        Fox Rothschild LLP
        Campbell Mithun Tower – Suite 2000
        222 South Ninth Street
        Minneapolis, MN 55402.

        **3.    YOU MUST RESPOND TO EACH CLAIM.** The Answer is your written
response to Plaintiff's Complaint.  In your Answer you must state whether you agree or disagree
with each paragraph of the Complaint.  If you believe that Plaintiff should not be given everything
asked for in the Complaint, you must say so in your Answer.

        **4.    YOU WILL LOSE YOUR CASE IF YOU DO NOT SEND A WRITTEN
RESPONSE TO THE COMPLAINT TO THE PERSON WHO SIGNED THIS SUMMONS.**
If you do not Answer within 20 days, you will lose this case. You will not get to tell your side of

**Attachment 1**

the story, and the Court may decide against you and award Plaintiff everything asked for in the Complaint. If you do not want to contest the claims stated in the Complaint, you do not need to respond. A default judgment can then be entered against you for the relief requested in the Complaint.

**5.** **LEGAL ASSISTANCE.** You may wish to get legal help from a lawyer. If you do not have a lawyer, the Court Administrator may have information about places where you can get legal assistance. **Even if you cannot get legal help, you must still provide a written Answer to protect your rights or you may lose the case.**

**6.** **ALTERNATIVE DISPUTE RESOLUTION.** The parties may agree to or be ordered to participate in an alternative dispute resolution process under Rule 114 of the Minnesota General Rules of Practice. You must still send your written response to the Complaint even if you expect to use alternative means of resolving this dispute.

Dated: November 25, 2019

**FOX ROTHSCHILD LLP**

By: _Elizabeth Patton_

Elizabeth A. Patton (#0391431)
Campbell Mithun Tower – Suite 2000
222 South Ninth Street
Minneapolis, MN 55402
Telephone: (612) 607-7000
epatton@foxrothschild.com

Kravitz, R. James (*pro hac vice* to be filed)
FOX ROTHSCHILD LLP
997 Lenox Drive
Lawrenceville, NJ, 08648
Telephone: (609) 896-3600
rkravitz@foxrothschild.com

**ATTORNEYS FOR PLAINTIFF
TODD MORTIER**

2

**Attachment 1**

STATE OF MINNESOTA

COUNTY OF HENNEPIN

DISTRICT COURT

FOURTH JUDICIAL DISTRICT
CASE TYPE: Contract

Todd J. Mortier, as Member Representative of
the former Members of Caisson Interventional,
LLC,

Plaintiff,

v.

LivaNova USA, Inc.,

Defendant.

Court File No. _____  ___ _____

**COMPLAINT**

Plaintiff Todd J. Mortier, as Member Representative of the former Members of Caisson

Interventional, LLC, ("Plaintiff") for his Complaint against Defendant LivaNova USA, Inc.

("Defendant" or "LivaNova") states:

### NATURE OF ACTION

1.      This case concerns the failure of LivaNova, a global medical device company with

annual sales of more than $1 billion and assets of more than $2.5 billion, to honor its legal

commitment to pursue product development, clinical trials, and regulatory approvals for a ground-

breaking minimally-invasive therapy to treat a particular form of mitral valve disease, called mitral

valve regurgitation, and to thus make this therapy available to the millions of patients suffering

from it.  Untreated mitral valve disease prevents millions of patients in the United States and ___ _ __

throughout the world from leading active, healthy lives and condemns them to early death.  Open

heart surgery, which is extremely invasive and expensive, is the only currently-available

replacement therapy to treat mitral valve disease.

**Attachment 1**

2.      In early 2011, Todd J. Mortier ("Mortier") and Cyril J. Schweich, Jr. ("Schweich")

developed an idea for a percutaneous mitral valve replacement system to treat mitral valve disease,

and they first presented their idea to LivaNova's predecessor in July 2011.  Their idea has the

potential to reach millions of patients with untreated mitral valve disease and to treat these patients

less invasively, at a lower cost, and without the risks and complications attendant to open heart

surgery.

3.      In September 2012, LivaNova invested in Caisson Interventional, LLC

("Caisson"), the company that Mortier and Schweich formed to develop their idea.  Caisson kept

LivaNova informed and involved at every step of the way as Caisson developed their idea into a

working product, conducted clinical trials, and demonstrated the safety and efficacy in a feasibility

study of Caisson's transvascular/transvenous mitral valve replacement ("TMVR") system in

human patients.

4.      On May 2, 2017, LivaNova entered into a written agreement, pursuant to which it

acquired all of the outstanding equity interests of Caisson—earlier than what was planned at the

time of LivaNova's initial investment in 2012—with the stated goal of becoming the first company

to bring to market, and make available to patients, a minimally-invasive percutaneous replacement

system for mitral valve disease.  LivaNova committed to complete product development and

clinical trials of the TMVR system and to obtain regulatory approvals and commercialization so it

could be made available to patients.

5.      As early as 2018, LivaNova began reducing the resources allocated to the recently-

acquired TMVR system; and in early 2019, far less than two years after the acquisition, LivaNova

fired Mortier and Schweich and began shopping the TMVR system to third parties.

2

**Attachment 1**

6.      In November 2019, LivaNova completely abandoned its commitment to the TMVR system by shutting it down and terminating the positions of all remaining Caisson employees who were working on the TMVR system.

7.      LivaNova knew, at the time of its acquisition of Caisson, that it would need to invest at least $100 million to $200 million over the course of five to ten years to bring the TMVR system to market.  Despite its actions, the number of patients affected by mitral valve disease and the market opportunity for the TMVR system has not changed since LivaNova's acquisition of Caisson.  The only thing that has changed is LivaNova's commitment to the TMVR system, to the patients who would have benefitted from this therapy, and to its contractual obligations.  What LivaNova has accomplished over the past two years is ensuring that this ground-breaking therapy will not be available to patients with mitral valve disease.

8.      For these reasons, Mortier, on behalf of all of the former members, optionholders, and employees of Caission, seeks to hold LivaNova accountable for its failure to honor its legal commitments.

### THE PARTIES

9.      Todd J. Mortier is citizen residing in Hennepin County, Minnesota.  Pursuant to Article IX of the Unit Purchase Agreement, as defined below, he is Member Representative of the former members of Caisson (other than LivaNova).  He brings this suit on behalf of those members and the optionholders and employees of Caisson at the time of its acquisition on May 2, 2017.

10.     Caisson is a Delaware limited liability company with its principal place of business in Hennepin County, Minnesota, and, prior to the acquisition, its members were LivaNova, Todd J. Mortier, Cyril J. Schweich, Jr., Andrew Forsberg, and Edward Anderson.  As defined below, Members refers to Todd J. Mortier, Cyril J. Schweich, Jr., Andrew Forsberg, and Edward Anderson.

3

**Attachment 1**

11.     At the time of its acquisition of Caisson, Sorin Group USA, Inc. was a Delaware corporation.  On information and belief, its principal place of business was either in Colorado or Texas.

12.     On information and belief, Sorin Group USA, Inc. was originally a subsidiary of a company called Sorin Group based out of Milan, Italy.  In 2015, Sorin Group merged with a company called Cyberonics Inc.  The merged company then changed its name to LivaNova PLC and moved its headquarters to London, England.

13.     On information and belief, at the time of its acquisition of Caisson, Sorin Group USA, Inc. was a wholly-owned subsidiary of LivaNova PLC based in London, England.

14.     On June 30, 2017, Sorin Group USA, Inc. changed its name to LivaNova Holding USA, Inc.

15.     On June 28, 2019, LivaNova Holding USA, Inc. merged into a subsidiary, LivaNova USA, Inc. effective July 1, 2019.  LivaNova USA, Inc. is the surviving entity of that merger.

16.     LivaNova USA, Inc. is a Delaware corporation.  On information and belief, its principal place of business is in Houston, Texas.

17.     On information and belief, Caisson is now a wholly-owned subsidiary of LivaNova USA, Inc. and is operated by LivaNova USA, Inc., a wholly-owned subsidiary of LivaNova PLC.

### JURISDICTION AND VENUE

18.     This Court has jurisdiction over the subject matter of this action pursuant to Minnesota Statutes § 484.01, subdivision 1(1).

19.     Venue lies in this court under Minnesota Statutes § 542.09 because the causes of action, or parts thereof, alleged herein arose in Hennepin County.

4

**Attachment 1**

20.     This Court has personal jurisdiction over LivaNova because, as detailed below, LivaNova invested in a company operating in Minnesota; placed members on the board of directors of that company, which members attended board meetings in Minnesota; later acquired that Minnesota-based company; made and directed payments to members, optionholders, and employees of that company in Minnesota; and continued to operate that company with employees in Minnesota who performed services within Minnesota.

## FACTUAL BACKGROUND

### Caisson's Business and Technology

21.     In early 2011, Mortier and Schweich developed an idea for a percutaneous mitral replacement system to treat mitral valve regurgitation, which is an abnormal reversal of blood flow into the atrium of the heart.  Mitral valve regurgitation is one type of, and can also be referred to as, mitral valve disease.

22.     Mitral valve disease provides a very large market opportunity.  Mitral valve disease is a significant and prevalent problem that affects a large population worldwide.  In fact, in the United States and Europe alone, there are approximately 14 million patients suffering from the problem.  The limitations of currently-available therapies limit the annual number of patients being treated for mitral valve disease to approximately 250,000 world-wide, leaving a huge population untreated.  A conservative estimate of only the United States' percutaneous mitral valve replacement market opportunity is $2.5 billion.

23.     Evidence for a very large mitral valve replacement market opportunity can be seen by comparing to other similar therapeutic markets.  Over the last decade, a similar percutaneous therapy called Transcatheter Aortic Valve Replacement ("TAVR") has been developed for patients with aortic valve disease.  In 2017, the actual worldwide TAVR market was $6.2 billion and growing.  In comparison, the incidence of mitral valve disease is known to be three to four times

5

**Attachment 1**

that of aortic valve disease, making the worldwide percutaneous mitral valve replacement market opportunity approximately $20 billion.

24.     At the time Mortier and Schweich began developing their treatment idea for mitral valve disease, there was a lack of minimally invasive treatment options.  In fact, invasive open heart surgery to replace the defective mitral valve was the only mitral valve replacement option at that time and is the still the only replacement option today.

25.     Mortier and Schweich wanted to develop a therapy that would be safe and effective at eliminating mitral valve regurgitation and would be less invasive than open heart surgery. Mortier's and Schweich's idea would have significantly changed the landscape of treatment options for mitral valve disease.

26.     While Mortier and Schweich were developing their idea, they became aware of other start-up companies working on other minimally invasive treatment options for mitral valve disease.  At the time of LivaNova's acquisition of Caisson in 2017, three other early stage start-up companies developing minimally invasive treatments for mitral valve disease had been acquired by large global medical device companies for payments ranging from $400 million to $458 million, with an average upfront payment of $336 million and average earnout/milestone payments of $83 million.

27.     Ultimately, as described below, Mortier and Schweich, through their company Caisson, developed one of the first TMVR systems and later sold that company to LivaNova.

28.     Mortier's and Schweich's treatment system allows for the replacement of the leaking mitral valve of a patient's heart through a non-invasive method, specifically through insertion of the replacement valve into the femoral vein in the patient's groin, tracking it up to the heart, and placing it inside the leaking mitral valve.

6

**Attachment 1**

29. The other more traditional method of treating mitral valve disease involves open heart surgery, which the TMVR system overcomes by being inserted via percutaneous means (i.e. through the skin).

30. Caisson was the first company to successfully complete a human implantation of a transvascular/transvenous mitral valve replacement system into a patient in the United States.

**Relationship Between LivaNova and Caisson**

31. On March 29, 2011, Mortier and Schweich made initial contact with a representative from Sorin Group (LivaNova PLC's predecessor) and on July 13, 2011, they met with representatives of Sorin Group in Milan, Italy. At the time, before the merger with Cyberonics Inc., the company was called Sorin Group, it was based in Milan, Italy, and, on information and belief, it had a US subsidiary called Sorin Group USA, Inc. For ease of reference, Plaintiff refers generally herein to LivaNova, whether referring to LivaNova's predecessor, Sorin Group USA, Inc., or the parent company of that predecessor, Sorin Group now known as LivaNova PLC.

32. On September 26, 2011, Mortier and Schweich presented their initial business plan to LivaNova representatives in Milan, Italy.

33. By early 2012, Mortier and Schweich had further developed their idea into a TMVR design concept.

34. On April 19, 2012, Mortier and Schweich filed a provisional patent application covering their invention with the United States Patent and Trademark Office ("USPTO").

35. On April 20, 2012, Mortier and Schweich presented their TMVR concept to LivaNova representatives in Milan, Italy.

36. On May 25, 2012, LivaNova sent a term sheet for the creation of a new company to develop the TMVR concept, which included a significant investment by LivaNova and an option

7

**Attachment 1**

for LivaNova to buy the new company, all of which was based on achieving agreed-upon milestones.

37.     On July 4, 2012, Mortier, Schweich, and LivaNova signed the term sheet.

38.     For the next two months, representatives from LivaNova engaged in contract negotiation and due diligence with Mortier and Schweich.

39.     On September 14, 2012, Caisson and LivaNova entered into a Preferred Unit Purchase Agreement under which LivaNova agreed to invest capital in Caisson to pursue development of the TMVR system, upon achievement of agreed-upon milestones.

40.     LivaNova invested and loaned a total of approximately $26 million under the Preferred Unit Purchase Agreement.

41.     On September 14, 2012, LivaNova, Caisson, Mortier, and Schweich entered into an Option Agreement under which LivaNova acquired an option to acquire Caisson for a purchase price of $90 million upon the date Caisson achieved a CE Mark for the TMVR system.

42.     Under the Preferred Unit Purchase Agreement, LivaNova was entitled to and did appoint two board members to sit on Caisson's board of directors with Mortier and Schweich. Those LivaNova board members were originally Brian Sheridan and Edward Andrle.  Shortly thereafter, LivaNova replaced Edward Andrle with Umberto Pasquali.  An independent board member was also added to establish the board of directors at five members.

43.     LivaNova also identified and provided a liaison who observed Caisson's progress and met with Caisson leadership on a regular basis, usually monthly.

44.     Under the Preferred Unit Purchase Agreement, Schweich was named Chief Executive Officer and Treasurer and Mortier was named Chief Operating Officer and Secretary.

**Attachment 1**

45.     On October 15, 2012, Caisson hired its first other employee besides Mortier and Schweich.

46.     On March 15, 2013, Mortier and Schweich filed a patent application with the USPTO which claimed priority to their 2012 provisional patent application and which issued as USPN 9,011,515 on April 21, 2015.

47.     In October 2013, Caisson completed the Concept Phase milestone under the Preferred Unit Purchase Agreement.  Caisson provided extensive and various documents and information to LivaNova evidencing that it had substantially achieved this milestone, to LivaNova's satisfaction, and what its plan was going forward.  With respect to this milestone, Caisson also met with the LivaNova investment committee.  Shortly thereafter, LivaNova provided funds pursuant to the Preferred Unit Purchase Agreement.

48.     In February 2015, Caisson completed the Development Phase milestone under the Preferred Unit Purchase Agreement.  Caisson provided extensive and various documents and information to LivaNova evidencing that it had achieved this milestone and what its plan was going forward.  With respect to this milestone, Caisson also met with the investment committee.  Shortly thereafter, LivaNova provided funds pursuant to the Preferred Unit Purchase Agreement.

49.     In October 2015, Caisson's first field clinical employee started.

50.     On June 15, 2016, Caisson successfully completed its first human implantation of a transvascular/transvenous TMVR system into a patient at New York University Medical Center.

51.     In July 2016, Caisson completed the Design Verification Phase milestone under the Preferred Unit Purchase Agreement.  Caisson provided extensive and various documents and information to LivaNova evidencing that it had achieved this milestone and what its plan was

9

**Attachment 1**

going forward.  Shortly thereafter, LivaNova provided funds pursuant to the Preferred Unit Purchase Agreement.

52.     From 2012 through the first half of 2017, Caisson worked diligently on developing Mortier's and Schweich's TMVR concept.  Caisson consistently met milestones and kept LivaNova representatives apprised of its progress.  In fact, board meetings focused heavily on technology and updates related to TMVR developments.

53.     On September 15, 2016, Caisson and LivaNova met in Maple Grove to discuss LivaNova's early acquisition of Caisson with the stated objective for the TMVR system to be the first percutaneous replacement option for mitral valve disease to market.  This required significantly expanded activity and resources with earlier timelines, more people, and more money. LivaNova later affirmed this strategy in December 2016 by providing a term sheet for an early acquisition of Caisson.

54.     LivaNova ultimately did acquire Caisson earlier than originally anticipated in the Option Agreement.

55.     In acquiring Caisson in this manner and at this timeframe, LivaNova was able to obtain a company developing a TMVR system for a fraction of what others in the marketplace have paid to get into this lucrative market.

<u>Unit Purchase Agreement</u>

56.     On May 2, 2017, Caisson and LivaNova entered into an Amended and Restated Option Agreement, which amended and restated the prior Option Agreement dated September 14, 2012.

57.     LivaNova exercised the purchase option on May 2, 2017.

58.     Pursuant to the terms of the Amended and Restated Option Agreement, Caisson's members agreed to sell and transfer their units in Caisson to LivaNova.

10

**Attachment 1**

59.     Accordingly, Caisson and LivaNova entered into a Unit Purchase Agreement dated May 2, 2017 for the purchase of all common units and compensatory units of Caisson ("Purchase Agreement").

60.     Under the Purchase Agreement, Caisson's members transferred and sold all of their units in Caisson to LivaNova and all optionholders received a cash payment for their options, which were fully vested and terminated.

61.     Thus, Caisson was acquired by LivaNova, became a wholly-owned subsidiary of LivaNova, and began being operated by LivaNova under the direction of a newly-hired General Manager.

62.     At the time, the members of Caisson (other than LivaNova) were listed in Exhibit A to the Purchase Agreement as Todd J. Mortier, Cyril J. Schweich, Jr., Andrew Forsberg, and Edward Anderson ("Members").

63.     Pursuant to Section 9.1 of the Purchase Agreement, Todd J. Mortier was appointed Member Representative and was thus given power to act on behalf of each such Member in any litigation involving the Purchase Agreement.

64.     At the time, there were numerous individuals who were listed as optionholders in Exhibit A to the Purchase Agreement ("Optionholders").

65.     Under the Purchase Agreement, the Optionholders entered into letter agreements with LivaNova regarding the termination of their compensatory unit options. In those agreements, the Optionholders agreed to appoint Todd J. Mortier, as the Member Representative, to be their lawful attorney-in-fact and agent on the same terms and to the same extent as in the Purchase Agreement.

11

**Attachment 1**

66.     Most of those Optionholders were also employees of Caisson. As employees, those individuals also entered into retention agreements with LivaNova that were attached to the Purchase Agreement ("Employees").

67.     Article III provides that the total purchase price paid to the Members and Optionholders would be $72 million ("Purchase Price"), paid in accordance with various terms set forth in Article III, and as described below. In addition, the parties agreed to an employee retention pool of $18 million, and the original purchase price of $90 million was reduced to $72 million to fund the employee retention pool.

68.     Article III provides that an initial payment of $13,435,704.40 would be paid to the Members and Optionholders at the closing of the acquisition. LivaNova made this payment.

69.     Article III provides that $1,064,295.60 would be paid to Caisson for further payment to the Optionholders at the closing of the acquisition. LivaNova made this payment.

70.     Article III provides that a payment of $14.4 million would be paid to the Members and Optionholders 12 months after the closing of the acquisition. LivaNova made this payment.

71.     Accordingly, 25% of the Purchase Price ($18 million) was guaranteed to be paid upon acquisition, 20% of the Purchase Price ($14.4 million) was guaranteed to be paid one year after acquisition, and the remaining 55% of the Purchase Price ($39.6 million) was contingent upon future events.

72.     Article III provides for the following payments upon the occurrence of certain milestones: (1) a $9 million payment to the Members and Optionholders upon the occurrence of the CE Mark Achievement ("CE Mark Payment"), representing 12.5% of the Purchase Price, (2) a $9 million payment to the Members and Optionholders upon the occurrence of premarket approval ("PMA") from the U.S. Food and Drug Administration ("FDA") for the TMVR system

12

**Attachment 1**

("PMA Payment"), representing 12.5% of the Purchase Price, and (3) earn-out payments of 20% of net sales of covered products worldwide from and after the date of the first commercial sale as calculated and paid under Section 4.2 ("Earn-Out Payments"), representing 30% of the Purchase Price.

73.     LivaNova has not yet made any of the CE Mark Payment, PMA Payment, and Earn-Out Payments, amounting to $39.6 million in unpaid payments to Caisson's former Members and Optionholders.

74.     Under the Purchase Agreement, Optionholders of Caisson who were also Employees of Caisson entered into retention agreements with LivaNova pursuant to which each Employee was eligible to receive retention payments referred to therein as bonuses ("Retention Payments").

75.     The total Retention Payments were $18 million, and the purchase price under the Purchase Agreement was reduced from $90 million to $72 million to fund the Retention Payments.

76.     The Retention Payments consisted of the following: (1) a first bonus payment paid shortly following the closing date, (2) a second bonus payment paid on the two-year anniversary of the closing date, (3) a third bonus payment paid after occurrence of the CE Mark Achievement, and (4) a fourth bonus payment paid upon the completion of enrollment in the FDA-approved pivotal investigational device exemption ("IDE") clinical investigation to generate evidence required for PMA. The latter three payments required the Employee to still be employed.

77.     With respect to the Retention Payments, the first and second bonus payments in the amount of $8.1 million have been made by LivaNova. The third and fourth bonus payments, in the amount of $9.9 million, have not been made by LivaNova.

**Attachment 1**

78.     LivaNova knew, at the time of its acquisition of Caisson, that it would need to invest at least $100 million to $200 million over the course of five to ten years to achieve the CE Mark, IDE, and PMA milestones and to begin commercial sales of the TMVR system.

79.     Section 4.3 of the Purchase Agreement is titled "Purchaser and Company Efforts" and states as follows:

> [LivaNova] shall, and shall cause [Caisson] to, undertake such efforts and use such level of care to obtain or achieve, and make business decisions relating to obtaining, achieving, (a) the CE Mark Achievement and (b) PMA, as are consistent with the efforts and level of care and business decisions [LivaNova] and its affiliates employ generally in the process of seeking, prosecuting and eventually obtaining product regulatory approvals worldwide from time to time, including considerations with regard to the cost/benefit, internal rate of return and return on investment' of such business decisions. [LivaNova] shall also, and shall also cause [Caisson] to, undertake such efforts and business decisions with respect to sales of Covered Products, which are subject to the Earn-Out Payments as are consistent with the efforts and level of care and business decisions [LivaNova] and its affiliates employ generally in their business from time to time.

80.     Section 11.3 provides that the terms and conditions of the Purchase Agreement "shall inure to the benefit of and be binding upon the respective successors and assigns of the Parties."

81.     LivaNova is a successor to the entity that entered into the Purchase Agreement and is thus bound by the Purchase Agreement.

82.     Section 11.4 of the Purchase Agreement states that the agreement and any controversy arising from it shall be governed by Delaware law.

83.     Section 11.9 of the Purchase Agreement states that the prevailing party in an action brought to enforce the terms of the Agreement "shall be entitled to reasonable attorneys' fees, costs, and disbursements."

14

**Attachment 1**

**LivaNova's Post-Purchase Actions**

84.    Since its acquisition of Caisson, LivaNova has dramatically decreased its financial commitment in the TMVR system by reducing budgets associated with developing and clinically evaluating the system, which has resulted in extended (or indefinite) timelines for the development, regulatory approval, and commercial sales of products covered by the Purchase Agreement.

85.    Specifically, starting in 2018, the year after its acquisition of Caisson, LivaNova spent millions of dollars less than what was budgeted for TMVR and executed a freeze on spending at the end of 2018. Additionally, in 2019, LivaNova reduced its budget for TMVR almost in half.

86.    Although the General Manager of the TMVR business unit had been focused in 2017 and 2018 on investing in and acquiring targets of related technology, LivaNova ceased those efforts in 2018 and ceased all interest in expanding to related areas. Thus, LivaNova ceased its efforts at expanding business opportunities in TMVR and related areas.

87.    Additionally, on information and belief, LivaNova decided in late 2018 or early 2019 to cease efforts to obtain regulatory approval and commercialization of the TMVR system and to instead try to sell the technology without having obtained those achievements.

88.    Since its acquisition of Caisson, LivaNova has maintained a lack of organizational structure necessary to effect clinical and regulatory objectives for the TMVR system. For example, LivaNova has not structured various functions consistent with their responsibilities, has expanded certain functions without a focus on or expansion of clinical functions, has failed to integrate or develop leadership in certain functions, and has failed to effectively transition the organization to a more functional structure with clear leadership and responsibilities.

89.    Additionally, in approximately May 2018, LivaNova implemented an update to the TMVR system design. These updates included a change to the implant that later resulted in clinical complications and a suspension to the clinical trials in late 2018. These issues necessitated a

15

**Attachment 1**

redesign of the implant, which required extensive repeat testing (bench, animal, durability) and a retesting of the design in new feasibility clinical trials. This material change to the acquired TMVR implant design caused a significant delay in the TMVR system development timeline and was directly tied to LivaNova's design decisions, not those of Caisson from prior to the acquisition.

90.     Since its acquisition of Caisson, LivaNova has failed to provide adequate resourcing of critical activities related to the TMVR system, particularly in the areas of clinical leadership and marketing functions.

91.     More specifically, LivaNova undertook workforce reductions and hiring freezes, failed to replace multiple key personnel for the TMVR system, and moved key personnel (e.g. the General Manager and Vice President of Marketing) fully or nearly fully into non-TMVR responsibilities within LivaNova.

92.     In February 2019, LivaNova terminated Mortier's and Schweich's employment with Caisson.

93.     Mortier and Schweich have active consulting agreements with Caisson and, despite their history with the TMVR system, LivaNova has not been requesting any consulting services from them or otherwise utilizing their vast knowledge and experience with the TMVR system, despite the fact that they created the concept and worked on its development for many years.

94.     In summary, of the approximate ten key players in the Caisson organization dedicated to development of the TMVR system at the time of the acquisition, seven no longer remained by the Fall of 2019 and none of those persons were replaced by LivaNova.

95.     On information and belief, LivaNova decided in approximately January 2019, far less than two years after its acquisition of Caisson, to end its efforts to obtain regulatory approval

**Attachment 1**

and commercialization of the TMVR system. Instead of trying to be the first to market, it began shopping the TMVR system to third parties. It later ceased those efforts too.

96.    LivaNova announced on November 20, 2019 to the employees working on the TMVR system that it was ending its efforts to develop the TMVR system at the end of the year and terminating their positions within Caisson.

97.    On November 20, 2019, LivaNova issued a press release announcing that it was ending the TMVR program effective at the end of 2019 and would be undertaking a restructuring of its heart valve business.

98.    LivaNova has not sold the TMVR business nor offered to return it to the former Members of Caisson.

99.    In making the decisions detailed above, LivaNova failed to undertake such efforts, level of care, and business decisions consistent with those generally employed by LivaNova and its affiliates in seeking, prosecuting, and eventually obtaining product regulatory approvals worldwide, as required by the Purchase Agreement.

100.    Additionally, in making the decisions detailed above, LivaNova failed to sufficiently and properly consider the cost/benefit, internal rate of return, and return on investment as required by the Purchase Agreement.

101.    In fact, LivaNova's efforts were lackluster and even became non-existent for approximately the last year. Such actions, or lack thereof, were arbitrary and unreasonable.

102.    Indeed, LivaNova made its decisions despite the significant business opportunity (in fact, widely considered to be multi-billion dollar business opportunity) and viable market for the TMVR system. Specifically, there are currently no commercial products for a TMVR system and no products that have obtained the CE Mark or PMA, leaving a big (but now unfulfilled)

**Attachment 1**

opportunity for LivaNova, which had previously agreed to become the first to market with a percutaneous replacement option for mitral valve disease.

### Notice to LivaNova Regarding Breach

103.   On October 21, 2019, undersigned counsel for Plaintiff sent a letter to LivaNova's Director, Corporate Legal Affairs demanding that LivaNova take appropriate action to comply with Section 4.3 of the Purchase Agreement.

104.   On November 13, 2019, outside counsel for LivaNova sent a response letter declining those demands.

105.   The letter did not mention that LivaNova, on information and belief, had already decided to end its efforts to develop the TMVR system and terminate the employees working on the system.

106.   Nor did the letter mention that LivaNova, on information and belief, was planning the following week to announce that it was ending its efforts to develop the TMVR system and terminating employees still working on the system.

## COUNT I – BREACH OF CONTRACT TO CAISSON'S MEMBERS

107.   Plaintiff incorporates the preceding paragraphs as though fully set forth herein.

108.   The parties entered into a contract in the form of the Purchase Agreement identified above.

109.   Under the Purchase Agreement, Caisson's former Members transferred and sold all of their units in Caisson to LivaNova for a specific purchase price to be paid in accordance with the terms of the Purchase Agreement.

110.   Under the Purchase Agreement, Caisson's Optionholders received a cash payment for their options, which were fully vested and terminated.

18

**Attachment 1**

111.    Caisson's former Members and Optionholders fully performed under the Purchase Agreement.

112.    LivaNova has failed to fully perform under the Purchase Agreement and, on information and belief, intends not to make the CE Mark Payment, PMA Payment, Earn-Out Payments and the remaining unpaid Retention Payments in accordance with the terms of the Purchase Agreement.

113.    Among other things, LivaNova has failed, in accordance with Section 4.3 of the Purchase Agreement, to undertake such efforts, level of care, and business decisions consistent with those generally employed by LivaNova and its affiliates in seeking, prosecuting, and eventually obtaining product regulatory approvals and to sufficiently and properly consider the cost/benefit, internal rate of return, and return on investment.

114.    LivaNova's failure to adhere to these contractual provisions constitutes a breach of the parties' contract.

115.    Because LivaNova has terminated its efforts to develop the TMVR system, Plaintiff understands that LivaNova will not be paying the remainder of the purchase price set forth in the Purchase Agreement.

116.    LivaNova's anticipated failure to make those payments constitutes an anticipatory breach of the parties' contract.

117.    As a direct and proximate result of LivaNova's breach and anticipated breach of contract, Caisson's former Members and Optionholders have been or will be damaged by LivaNova's breach in the amount of $39.6 million, which represents the CE Mark Payment, PMA Payment, and Earn-Out Payments remaining to be paid to the former Members and Optionholders under the Purchase Agreement, plus attorneys' fees.

19

**Attachment 1**

118.    As a direct and proximate result of LivaNova's breach and anticipated breach of contract, Caisson's former Optionholders who were also Employees have been or will be damaged by LivaNova's breach in the amount of $9.9 million, which represents the Retention Payments remaining to be paid to the Employees under the Purchase Agreement, plus attorneys' fees.

119.    Plaintiff, as Member Representative of the former Members and attorney-in-fact for the former Optionholders of Caisson, has the right and authority to bring an action for breach of contract and to recover damages on behalf of the Members and Optionholders listed in the Purchase Agreement.

120.    Plaintiff, as Member Representative of the former Members and attorney-in-fact for the former Optionholders of Caisson, has the right and authority to bring an action for breach of contract and to recover damages on behalf of the Employees of Caisson who were also Optionholders who gave Plaintiff the authority to bring suit on their behalf, particularly considering the purchase price was reduced to $72 million to fund the Retention Payments.

## COUNT II – BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

121.    Plaintiff incorporates the preceding paragraphs, except paragraphs 99–100, 103– 106, 107–120, as though fully set forth herein.

122.    The parties entered into a contract in the form of the Purchase Agreement identified above. LivaNova's principal purpose in acquiring Caisson was to take control over Caisson in order to work toward, and ultimately achieve, regulatory approval and commercialization of the TMVR system and to become the first to market with a percutaneous replacement option for mitral valve disease.

123.    That contract contains an implied covenant of good faith and fair dealing. Included in this covenant, separate from the efforts required under Section 4.3 of the Purchase Agreement, is LivaNova's promise to continue to develop the TMVR system with the intent of being first to

**Attachment 1**

market with a percutaneous replacement option for mitral valve disease and to exercise good faith and use reasonable efforts to actually achieve, or at least make all attempts to achieve, regulatory approval and commercialization.

124.   Also included in this covenant, separate from the efforts required under Section 4.3 of the Purchase Agreement, is LivaNova's promise to not arbitrarily and unreasonably interfere with clinical evaluation, regulatory approval, and commercialization of the TMVR system or to cease its efforts toward clinical evaluation, regulatory approval, and commercialization of the TMVR system so quickly and in bad faith.

125.   Also included in this covenant, separate from the efforts required under Section 4.3 of the Purchase Agreement, was that in the event LivaNova ceased its efforts toward clinical evaluation, regulatory approval, and commercialization of the TMVR system, it would return Caisson and the TMVR system and intellectual property rights to its former Members.

126.   LivaNova's achievement of clinical evaluation, regulatory approval, and commercialization would have required under the Purchase Agreement for LivaNova to make payments to Caisson's former Members and Optionholders corresponding with those events.

127.   By engaging in the acts and omissions described above, LivaNova has breached the implied covenant of good faith and fair dealing by, among other things, acting opportunistically, acting arbitrarily and unreasonably, exercising discretion in bad faith, and acting without good faith, fairness, and reasonableness in forgoing the intent of being first to market with a percutaneous replacement option for mitral valve disease and in interfering with and ultimately halting the pursuit and timely achievement of regulatory approval and commercialization of the TMVR system, thereby frustrating the fruits of the bargain the former Members of Caisson reasonably expected.

**Attachment 1**

128. But for LivaNova's breach of the implied covenant of good faith and fair dealing, regulatory approval and commercialization would have been achieved, triggering LivaNova's obligation to make the CE Mark Payment, PMA Payment, and Earn-Out Payments described in the Purchase Agreement, which was an expectation of the former Members of Caisson at the time of contracting.

129. As a direct and proximate result of LivaNova's breach of the implied covenant of good faith and fair dealing, Caisson's former Members and Optionholders have been or will be damaged by LivaNova's breach in the amount of $39.6 million, which represents the CE Mark Payment, PMA Payment, and Earn-Out Payments remaining to be paid to the former Members and Optionholders under the Purchase Agreement, plus attorneys' fees.

130. As a direct and proximate result of LivaNova's breach of the implied covenant of good faith and fair dealing, Caisson's former Optionholders who were also Employees have been or will be damaged by LivaNova's breach in the amount of $9.9 million, which represents the Retention Payments remaining to be paid to the Employees under the Purchase Agreement, plus attorneys' fees.

131. Plaintiff, as Member Representative of the former Members and attorney-in-fact for the former Optionholders of Caisson, has the right and authority to bring an action for breach of the covenant of good faith and fair dealing and to recover damages and equitable relief on behalf of the Members and Optionholders listed in the Purchase Agreement.

132. Plaintiff, as Member Representative of the former Members and attorney-in-fact for the former Optionholders of Caisson, has the right and authority to bring an action for breach of the covenant of good faith and fair dealing and to recover damages and equitable relief on behalf of the Employees of Caisson who were also Optionholders who gave Plaintiff the authority to

**Attachment 1**

bring suit on their behalf, particularly considering the purchase price was reduced to $72 million to fund the Retention Payments.

## COUNT III – UNJUST ENRICHMENT
### (In the Alternative to Counts I and II)

133.   Plaintiff incorporates the preceding paragraphs, except paragraphs 107–132, as though fully set forth herein.

134.   Caisson's former Members and Optionholders conferred a benefit upon LivaNova, specifically when the Members sold all of their units in Caisson to LivaNova and the Optionholders' options were terminated for a cash payment, so that LivaNova could develop the TMVR system and become the first to market with a percutaneous replacement option for mitral valve disease.

135.   LivaNova retained the benefit of those units and the acquisition of the TMVR system without fully paying for them, without continuing to pursue the agreed-upon strategy to become the first to market with a percutaneous replacement option for mitral valve disease, and without offering to return Caisson and the TMVR system and intellectual property rights to its former Members when it decided to cease its efforts to commercialize the TMVR system.

136.   As a result, LivaNova has been unjustly enriched in the amount of $49.5 million, representing the $39.6 million in unpaid CE Mark Payment, PMA Payment, and Earn-Out Payments to Caisson's former Members and Optionholders and the $9.9 million in unpaid Retention Payments to Caisson's Employees.

137.   It would be inequitable to allow LivaNova to retain that monetary benefit.

138.   Plaintiff, as Member Representative of the former Members and attorney-in-fact for the former Optionholders of Caisson, has the right and authority to bring an action for unjust

**Attachment 1**

enrichment and to recover damages on behalf of the Members and Optionholders listed in the Purchase Agreement.

139.    Plaintiff, as Member Representative of the former Members and attorney-in-fact for the former Optionholders of Caisson, has the right and authority to bring an action for unjust enrichment and to recover damages on behalf of the Employees of Caisson who were also Optionholders who gave Plaintiff the authority to bring suit on their behalf, particularly considering the purchase price was reduced to $72 million to fund the Retention Payments.

## JURY DEMAND

Pursuant to Rule 38.01 of the Minnesota Rules of Civil Procedure, Plaintiff demands a trial by jury on all triable issues.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment from this Court as follows:

1.    Entering judgment in favor of Plaintiff;

2.    Awarding Plaintiff $39.6 million in damages to be paid to the Members and Optionholders of Caisson listed in the Purchase Agreement;

3.    Awarding Plaintiff $9.9 million in damages to be paid to the Employees of Caisson;

4.    Requiring Defendant to return Caisson and the TMVR system and intellectual property rights to its former Members;

5.    Awarding Plaintiff his attorneys' fees and costs of suit incurred herein; and

6.    Awarding such other and further relief as the Court may deem equitable.

**Attachment 1**

Dated: November 25, 2019

**FOX ROTHSCHILD LLP**

By: _Elizabeth Patton_
Elizabeth A. Patton (#0391431)
Campbell Mithun Tower – Suite 2000
222 South Ninth Street
Minneapolis, MN 55402
Telephone: (612) 607-7000
epatton@foxrothschild.com

Kravitz, R. James (*pro hac vice* to be filed)
FOX ROTHSCHILD LLP
997 Lenox Drive
Lawrenceville, NJ, 08648
Telephone: (609) 896-3600
rkravitz@foxrothschild.com

**ATTORNEYS FOR PLAINTIFF**
**TODD MORTIER, AS MEMBER**
**REPRESENTATIVE OF THE FORMER**
**MEMBERS OF CAISSON**
**INVERVENTIONAL, LLC**

**Attachment 1**

## ACKNOWLEDGMENT REQUIRED BY
## MINN. STAT. § 549.211, SUBD. 1

Defendant acknowledges that costs, disbursements, and reasonable attorneys' fees and witness fees may be awarded to the opposing party pursuant to Minnesota Statutes § 549.211, subdivision 2.

Dated:  November 25, 2019

**FOX ROTHSCHILD LLP**

By:   *Elizabeth Patton*

Elizabeth A. Patton (#0391431)
Campbell Mithun Tower – Suite 2000
222 South Ninth Street
Minneapolis, MN 55402
Telephone: (612) 607-7000
epatton@foxrothschild.com

Kravitz, R. James (*pro hac vice* to be filed)
FOX ROTHSCHILD LLP
997 Lenox Drive
Lawrenceville, NJ, 08648
Telephone: (609) 896-3600
rkravitz@foxrothschild.com

**ATTORNEYS FOR PLAINTIFF
TODD J. MORTIER, AS MEMBER
REPRESENTATIVE OF THE FORMER
MEMBERS OF CAISSON
INVERVENTIONAL, LLC**

26

**Attachment 1**