## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Todd J. Mortier, as Member Representative
of the former Members of Caisson
Interventional, LLC,

      Plaintiff,

v.

LivaNova USA, Inc.,

      Defendant.

File No. 19-cv-3140 (ECT/DTS)


**OPINION AND ORDER**

---

Elizabeth A. Patton, Fox Rothschild LLP, Minneapolis, MN; R. James Kravitz, Fox
Rothschild LLP, Lawrenceville, NJ; and Dennis B. Johnson, Chestnut Cambronne PA,
Minneapolis, MN, for Plaintiff Todd J. Mortier, as Member Representative of the former
Members of Caisson Interventional, LLC.

Isaac B. Hall and CB Baga, Faegre Drinker Biddle & Reath LLP, Minneapolis, MN; and
Heather Carson Perkins, Faegre Drinker Biddle & Reath LLP, Denver, CO, for Defendant
LivaNova USA, Inc.

---

Plaintiff Todd J. Mortier co-founded Caisson Interventional, LLC, to develop a
minimally invasive medical device to treat mitral valve disease, a heart condition.
Defendant LivaNova USA, Inc., is the United States subsidiary of a global medical device
company that invested in and later acquired Caisson. In this case, Mortier, on behalf of
former members and option holders of Caisson (Mortier is a former member), alleges that
LivaNova breached its obligations under the acquisition agreement. LivaNova contends
that Mortier does not have contractual or other legal authority to pursue claims against it
on behalf of others and has moved for judgment on the pleadings against these claims under

Federal Rule of Civil Procedure 12(c).  Alternatively, LivaNova seeks an order requiring those whom Mortier purports to represent to be substituted as parties in this case under Federal Rule of Civil Procedure 17.  LivaNova's motion will be denied because Mortier is a real party in interest in this action.

I[1]

In early 2011, Mortier and Cyril J. Schweich, Jr., developed an idea for a minimally invasive transvascular/transvenous mitral valve replacement ("TMVR") system that could be used to treat mitral valve regurgitation, a form of mitral valve disease (a heart condition) that affects millions of people.  Compl. ¶¶ 1–2, 21–30 [ECF No. 1-1].  Later that year, they presented their idea and business plan to LivaNova.[2]  *Id.* ¶¶ 2, 31–32.  By early 2012, Mortier and Schweich created a design concept and filed a provisional patent application. *Id.* ¶¶ 33–34.  On May 25, 2012, after further discussions, LivaNova sent Mortier and Schweich a term sheet for the creation of a new company to develop the TMVR concept,

---

[1]    In describing the relevant facts and resolving LivaNova's motion for judgment on the pleadings, all factual allegations in the complaint are accepted as true, and all reasonable inferences are drawn in Mortier's favor.  *Ashley Cnty. v. Pfizer, Inc.*, 552 F.3d 659, 663, 665 (8th Cir. 2009).

[2]    Mortier and Schweich actually met with LivaNova's predecessor, Sorin Group, a company based in Milan, Italy, that had a United States subsidiary called Sorin Group USA, Inc.  *See* Compl. ¶ 31.  In 2015, Sorin Group combined with a company called Cyberonics, Inc. to form LivaNova PLC.  *Id.* ¶ 12.  Sorin Group USA remained a wholly owned subsidiary of LivaNova PLC and eventually changed its name to LivaNova Holding USA, Inc., on June 30, 2017.  *Id.* ¶¶ 13–14.  Effective July 1, 2019, LivaNova Holding USA merged into another subsidiary—Defendant LivaNova USA.  *Id.* ¶ 15.  For efficiency and clarity, the Parties use only "LivaNova" when describing the facts of the case but intend for "LivaNova" to include Sorin Group, Sorin Group USA, LivaNova PLC, and LivaNova Holding USA.  *See id.* ¶ 31; Def.'s Mem. in Supp. at 3 n.1 [ECF No. 28].  That convention will be followed here.

2

which included "significant investment" by LivaNova and an option for LivaNova to buy the company, contingent on the satisfaction of agreed-upon benchmarks. *Id.* ¶¶ 35–36. On July 4, 2012, Mortier, Schweich, and LivaNova signed the term sheet. *Id.* ¶ 37.

On September 14, 2012, LivaNova and the new company, Caisson Interventional, entered into an agreement whereby LivaNova agreed to invest and loan a total of approximately $26 million to Caisson for development of the TMVR system. *Id.* ¶¶ 39–40. On the same day, LivaNova, Caisson, Mortier, and Schweich also entered into an agreement that provided LivaNova with the option to acquire Caisson for $90 million upon Caisson's achievement of a CE Mark for the TMVR system.[3] *Id.* ¶ 41. Over the next four years, Caisson met a number of milestones, and LivaNova provided funds in accordance with the parties' agreement. *Id.* ¶¶ 46–52.

On September 15, 2016, representatives from Caisson and LivaNova met to discuss LivaNova's early acquisition of Caisson. *Id.* ¶ 53. On May 2, 2017, LivaNova entered into an amended and restated option agreement with Caisson and its members. *Id.* ¶¶ 56, 58. That same day, LivaNova exercised its option to purchase all of Caisson's outstanding equity interests "with the stated goal of becoming the first company to bring to market, and

---

[3]      The CE Mark signifies that products sold in the European Economic Area "have been assessed to meet high safety, health, and environmental protection requirements." *CE Marking*, European Commission, https://ec.europa.eu/growth/single-market/ce-marking_en (last visited June 14, 2021). "By affixing the CE marking to a product, a manufacturer declares that the product meets all the legal requirements for CE marking[.]" *Id.*

make available to patients," the TMVR system.[4]  *Id.* ¶¶ 4, 57, 59, 61; Def.'s Mem. in Supp., Ex. A [ECF No. 30-1] ("Unit Purchase Agreement").  LivaNova "committed to complete product development and clinical trials of the TMVR system and to obtain regulatory approvals and commercialization so it could be made available to patients."  Compl. ¶ 4. Pursuant to the Unit Purchase Agreement, Caisson's members transferred and sold all of their units in Caisson to LivaNova and all option holders received a cash payment for their options, which were fully vested and terminated.  *Id.* ¶ 60.  At the time of its acquisition, Caisson had four members other than LivaNova—Mortier, Schweich, Andrew Forsberg, and Edward Anderson—and forty option holders.  *Id.* ¶¶ 10, 62; Unit Purchase Agreement, Ex. A.

Of central importance here, the Unit Purchase Agreement appointed Mortier the Member Representative and delineated the scope of that appointment:

> **Section 9.1** <u>Appointment of the Member Representative</u>.  Each of the Members hereby irrevocably appoints the Member Representative as its, his or her true and lawful attorney-in-fact and agent, with full power of substitution or re-substitution, to act solely and exclusively on behalf of such Member with respect to the transactions contemplated by this Agreement and the Escrow Agreement in accordance with the terms and provisions hereof, and to act on behalf of such Member in any litigation or arbitration involving any of this Agreement or the Escrow Agreement, to do or refrain from doing all such further acts and things, and to execute all such documents as the

---

[4]  It was Sorin Group USA, not LivaNova, that was party to the Unit Purchase Agreement (and earlier agreements) at the time it was made.  Unit Purchase Agreement at 1.  Section 11.3 of the Unit Purchase Agreement provides that its terms and conditions "shall inure to the benefit of and be binding upon the respective successors and assigns of the Parties."  In the complaint, Mortier alleges that LivaNova is a successor of Sorin Group USA and therefore bound by the Unit Purchase Agreement (and LivaNova does not dispute this allegation).  Compl. ¶ 81; *see supra* note 2.

Member Representative shall deem necessary or appropriate in connection with the transactions contemplated hereby, including the power:

. . .

(b)    to act for such Member with regard to matters pertaining to indemnification referred to in this Agreement, including the power to compromise any indemnity claim on behalf of such Member, and otherwise to transact matters of litigation related to this Agreement;

. . .

(f)    to engage counsel, and to rely on the advice of such counsel in carrying out the Member Representative's duties hereunder;

(g)    to do or refrain from doing any further act or deed on behalf of such Member that the Member Representative deems necessary or appropriate in his sole discretion relating to the subject matter of this Agreement as fully and completely as such Member could do if personally present; and

(h)    to receive service of process in connection with any claims under this Agreement.

Unit Purchase Agreement § 9.1 and at 1; *see* Compl. ¶ 63.  The Unit Purchase Agreement further provided that "[t]he appointment of the Member Representative shall be deemed coupled with an interest and shall be irrevocable, and the Purchaser and any other Person may conclusively and absolutely rely, without inquiry, upon any action of the Member Representative in all matters referred to herein."  Unit Purchase Agreement § 9.1; *see id.* § 9.4 ("The Purchaser shall be entitled to rely, and shall be fully protected in relying, upon any statements furnished to it by, and the actions of, the Member Representative.").  Mortier signed the Unit Purchase Agreement as both a "Member" and the "Member Representative."  *Id.* at 39, 41.

Pursuant to the Unit Purchase Agreement, each option holder entered into a letter agreement with LivaNova regarding the termination of their compensatory unit options. Compl. ¶ 65.  Those agreements likewise appointed Mortier to represent the option holders:

> 3. Under the terms of the Purchase Agreement, each of the Members will irrevocably appoint Todd Mortier as his true and lawful attorney-in-fact and agent to act solely and exclusively on behalf of such Member with respect to the Transaction, the Purchase Agreement and the Escrow Agreement to be entered into in connection with the Purchase Agreement in accordance with the terms and provisions of the Purchase Agreement, and to act on behalf of such Member in any litigation or arbitration involving any of the Purchase Agreement or the Escrow Agreement, to do or refrain from doing all such further acts and things, and to execute all such documents as the Member Representative shall deem necessary or appropriate in connection with the transactions contemplated thereby.  You hereby acknowledge and approve the appointment of Todd Mortier, as the Member Representative, as your lawful attorney-in-fact and agent on the same terms and to the same extent as the Member Representative is appointed by the Members pursuant to the terms of the Purchase Agreement. You also agree to indemnify the Member Representative on the same terms and to the same extent as agreed to by the Members under Section 9.2 of the Purchase Agreement.

Def.'s Mem. in Supp., Ex. B [ECF Nos. 31–31-1].  A majority of the option holders also were employees of Caisson and entered into separate retention agreements with LivaNova that provided for the distribution of retention payments.  Compl. ¶¶ 66, 74.

Under the Unit Purchase Agreement, LivaNova agreed to pay a total purchase price of $72 million.  *Id.* ¶ 67.  The Parties also agreed to an employee retention pool of $18 million.  *Id.*  Article III of the Unit Purchase Agreement laid out the initial payments to be made by LivaNova to Caisson's members and option holders as well as a schedule of payments to be made following the acquisition, some of which were contingent upon the

6

occurrence of future events, including CE Mark achievement, premarket approval of the TMVR system from the FDA, and commercial sales of the TMVR system. *Id.* ¶¶ 68–72; *see* Unit Purchase Agreement §§ 3.1, 3.2. LivaNova met its initial and 12-month payment obligations, which totaled $32.4 million (or 45%) of the purchase price, but it has not made any other payments to Caisson's former members and option holders. Compl. ¶¶ 68–73. The employee retention agreements provided for a similar schedule of four payments, the last three of which required the employee to remain employed. *Id.* ¶ 76. LivaNova made only the first two retention payments, which totaled $8.1 million. *Id.* ¶ 77.

In 2018, LivaNova began significantly reducing its budget for the development and clinical evaluation of the TMVR system. *Id.* ¶¶ 5, 84–86. By early 2019, LivaNova had "cease[d] efforts to obtain regulatory approval and commercialization of the TMVR system" and instead focused its efforts on selling the technology to third parties. *Id.* ¶¶ 5, 87, 95. These actions resulted in indefinite extensions of the timelines for the payment-triggering events established in the Unit Purchase Agreement. *Id.* ¶¶ 84, 88–90. LivaNova also terminated several individuals assigned to the development of the TMVR system, including Mortier and Schweich. *Id.* ¶¶ 91–94. Mortier's and Schweich's severance agreements contained a waiver and release of claims, but claims arising from any right to payment under the Unit Purchase Agreement were specifically exempted. Def.'s Mem. in Supp., Ex. D § D [ECF No. 33]; Ex. E § D [ECF No. 33-1]. On October 21, 2019, Mortier's counsel sent a letter to LivaNova's Director of Corporate Legal Affairs demanding LivaNova's compliance with its obligations under Section 4.3 of the Unit Purchase Agreement, but LivaNova declined those demands. Compl. ¶¶ 103–04. On November 20,

2019, LivaNova announced its intent to end the TMVR program and terminated all remaining Caisson employees. *Id.* ¶¶ 6, 96–97.

On November 25, 2019, Mortier brought this case against LivaNova in Hennepin County District Court on behalf of himself and all persons who were members, option holders, and employees of Caisson at the time of its acquisition in May 2017.[5] *Id.* ¶ 9. In the complaint, Mortier alleges that LivaNova did not "honor its legal commitment to pursue product development, clinical trials, and regulatory approvals" for the mitral valve replacement therapy it acquired from Caisson and acted in bad faith by dissolving its TMVR program before the contingencies to its remaining payments under the Unit Purchase Agreement occurred. Compl. ¶¶ 1, 7, 79; *see* Unit Purchase Agreement §§ 3.1, 3.2, 4.3. Mortier asserts claims for breach of contract, Compl. ¶¶ 107–20, breach of the covenant of good faith and fair dealing, *id.* ¶¶ 121–32, and, alternatively, unjust enrichment, *id.* ¶¶ 133–39. LivaNova subsequently removed the action to federal district court. Notice of Removal [ECF No. 1].[6]

II

There is subject-matter jurisdiction over this action pursuant to 28 U.S.C § 1332(a). The Parties are of diverse citizenship. Mortier is a citizen of Minnesota. Compl. ¶ 9; Notice of Removal ¶ 3(b)(1). LivaNova USA is a Delaware corporation with its principal

---

[5]    In addition to being Member Representative, Mortier is a former member of Caisson. *See* Unit Purchase Agreement at 1, Ex. A; Def.'s Mem. in Supp. at 1–2.

[6]    On February 12, 2021, the Parties entered into a stipulation in which Mortier agreed to forgo claims on behalf of former Caisson employees for relief pertaining to retention payments. Stipulation [ECF No. 25]; Pl.'s Mem. in Opp'n at 4 n.3 [ECF No. 35].

place of business in Houston, Texas.   Compl. ¶ 16; Notice of Removal ¶ 3(b)(2).   The amount in controversy exceeds $75,000.  *See* Compl. at 24; Notice of Removal ¶ 3(a).

Neither Mortier nor LivaNova argues that the citizenship of represented persons matters in determining the presence of complete diversity (or that, if it did, there would not be complete diversity), and this appears to be correct.   "The general rule is that the citizenship of the real party in interest is determinative in deciding whether diversity jurisdiction exists."  6A Mary Kay Kane, *Federal Practice and Procedure* § 1556 (3d ed. Apr. 2021 Update).  "Normally, a representative may rely upon his citizenship, rather than the citizenship of the party he represents, when he asserts federal jurisdiction based upon diversity of citizenship."  *Gross v. Hougland*, 712 F.2d 1034, 1037 (6th Cir. 1983) (holding that a fiduciary "may rely upon his citizenship if he can establish that he is the real party in interest by demonstrating that the law of the appointing authority permits him to sue in his own name, without joining any of the persons that he represents"); *see Corfield v. Dallas Glen Hills LP*, 355 F.3d  853, 865 n.10 (5th Cir. 2003) ("The 'real party to the controversy' test does not require a federal court to consider the citizenship of non-parties who have an interest in the litigation or might be affected by the judgment.  [It] requires consideration of the citizenship of non-parties when a party already before the court is found to be a non-stake holder/agent suing only on behalf of another.").  So, if Mortier is a real party in interest and has proper authority to proceed on behalf of the persons he seeks to represent—and as will be discussed shortly, he is and does—then only Mortier's citizenship is relevant to determining the existence of diversity jurisdiction.

III

"Judgment on the pleadings is appropriate where no material issue of fact remains to be resolved and the movant is entitled to judgment as a matter of law." *Lansing v. Wells Fargo Bank, N.A.*, 894 F.3d 967, 971 (8th Cir. 2018) (citation omitted). A motion for judgment on the pleadings under Rule 12(c) is assessed under the same standard as a motion to dismiss under Rule 12(b)(6). *Ashley Cnty. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009). In reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014) (citation omitted). Although the factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). The complaint must "state a claim to relief that is plausible on its face." *Id.* at 570.[7]

---

[7]     LivaNova filed six exhibits with its motion: the Unit Purchase Agreement, a collection of compensatory unit option termination agreements, a collection of confidential waiver and release of claim agreements signed by Caisson employees in connection with their termination, waiver and release of claim agreements signed by Mortier and Schweich in connection with their termination, and Mortier's answers to LivaNova's first set of interrogatories. ECF Nos. 30–33-2. Considering "matters outside the pleadings" generally transforms a Rule 12 motion into one for summary judgment, but not when the documents are "necessarily embraced" by the pleadings. *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017) (citations omitted). "In general, materials embraced by the complaint include documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleadings." *Id.* (internal quotation marks and citation omitted). Courts "additionally consider matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned." *Id.* (internal quotation marks and citations omitted). The Unit Purchase Agreement and unit option termination agreements

In general, "[a]n action must be prosecuted in the name of the real party in interest." Fed. R. Civ. P. 17(a).  The "modern function of the rule in its negative aspect is simply to protect the defendant against a subsequent action by the party actually entitled to recover, and to insure generally that the judgment will have its proper effect as res judicata."  *Id.*, advisory committee's note to 1966 amendment.  The effect of the rule is that an action must be brought by the person who "actually possess[es], under the substantive law, the right sought to be enforced."  *Curtis Lumber Co. v. Louisiana Pac. Corp.*, 618 F.3d 762, 771 (8th Cir. 2010) (citation omitted); 6A Mary Kay Kane, *Federal Practice and Procedure* § 1543 (3d ed. Apr. 2021 Update).  "As this action is in federal court based on diversity of citizenship, state law governs substantive law issues."  *Paine v. Jefferson Nat'l Life Ins. Co.*, 594 F.3d 989, 992 (8th Cir. 2010) (citation omitted); *see also Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Fed. Ins. Co. v. Bear Indus., Inc.*, No. Civ. 03-251-SLR, 2004 WL 2434303, at *2 (D. Del. Oct. 6, 2004) ("Whether a party in a diversity suit is a real party in interest is a matter of substantive state law, the issue being whether a party is entitled to enforce a right under state law.").  Here, the Parties agree that Delaware law is the substantive governing law.  *See* Compl. ¶ 82; Unit Purchase Agreement § 11.4 (stating that the agreement and any controversy arising out of or relating to it shall be governed by

---

are embraced by the complaint and properly may be considered.  Though no party has questioned their authenticity, the contents of the waiver and release claim agreements are not embraced by the pleadings; however, it is not necessary to consider the waiver and release agreements to resolve LivaNova's motion.

Delaware law); Def.'s Mem. in Supp. at 9 n.4 [ECF No. 28]; Pl.'s Mem. in Opp'n at 7 n.5 [ECF No. 35].[8]

A

LivaNova first argues that Mortier is not a real party in interest because Caisson's former members and option holders did not "assign" their claims to him. Def.'s Mem. in Supp. at 8–9; *see* Def.'s Reply Mem. at 8–9 [ECF No. 39]. Mortier counters that an express assignment of claims is not required for him to pursue claims on behalf of Caisson's former members and option holders and that, if it were, the Member Representative provisions of the Unit Purchase Agreement and unit option termination agreements operate as an assignment. Pl.'s Mem. in Opp'n at 8–15.[9]

---

[8]    In his response memorandum, Mortier suggested that LivaNova had waived its real-party-in-interest defense by not raising the issue with reasonable promptness. Pl.'s Mem. in Opp'n at 6. It would not be appropriate to deny LivaNova's motion on this basis. Though LivaNova waited thirteen months after it filed its answer to bring this motion, it raised Mortier's lack of standing to pursue claims on behalf of persons other than himself and the lack of assignment of claims of other members and option holders to Mortier as affirmative defenses in its answer, ECF No. 9 at 40, and the circumstances of the delay here are distinguishable from those in the authority cited by Mortier, *see United HealthCare Corp v. Am. Trade Ins. Co.*, 88 F.3d 563, 568–69 & n.3 (8th Cir. 1996) (holding appellant-defendant had waived the issue of whether the plaintiff was a real party in interest by not raising it until the pre-trial conference one week before trial and noting there was no record of the defendant asserting a Rule 17(a) defense in his motion for judgment on the pleadings or summary judgment motion).

[9]    LivaNova notes that, in its discovery requests, it "asked Mortier to identify any assignments he received to pursue the claims in this litigation on behalf of absent parties" and avers he identified none. Def.'s Mem. in Supp. at 9 n.3. However, in his response to LivaNova's interrogatory, Mortier referred to Section 9.1 of the Unit Purchase Agreement and the unit option termination agreements "appointing [him] as Member Representative, attorney-in-fact, and agent, including in litigation involving the 2017 Purchase Agreement." Ex. F at 8–9 [ECF No. 33-2]; Pl.'s Mem. in Opp'n at 13 n.9.

An assignment of claims would undoubtedly be sufficient to allow Mortier to bring suit, but it is not necessary. By its own terms, Rule 17 does not support LivaNova's argument. Rule 17 enumerates several specific instances in which a person may sue as the real party in interest other than through an outright assignment of claims, including as an executor, an administrator, or a trustee. Fed. R. Civ. P. 17 (a)(1). The list is intended to be "illustrative" and non-exclusive, "carry[ing] no negative implication to the effect that there are not other instances of recognition as the real party in interest of one whose standing as such may be in doubt." *Id.*, advisory committee's note to 1966 amendment.

In support of its position that an assignment of claims is required for Mortier to sue in his own name, LivaNova cites *SolarReserve CSP Holdings, LLC v. Tonopah Solar Energy, LLC*, C.A. No. 2020-0064-JRS, 2020 WL 4251968 (Del. Ch. July 24, 2020). In *SolarReserve*, the court recognized that, under Delaware law, where there has been a complete assignment of claims, the assignor is not the real party in interest and the right to maintain a lawsuit belongs to the assignee alone. *Id.* at *4–5. But *SolarReserve* does not stand for the proposition that an assignment of claims is required under Delaware law to sue as the real party in interest. LivaNova seizes upon the court's broad statement that some courts have recognized that "a grant of a mere power of attorney, short of an assignment of a claim, does not change the real party in interest." *Id.* at *5. But the circumstances of the case are more nuanced. The plaintiff and its nonparty lender, an unaffiliated third party, executed an agreement in which the plaintiff expressly assigned all of its claims against the defendant arising from a business agreement to the lender, giving the lender the sole right to prosecute its claims against the defendant and the sole

13

entitlement to the proceeds of such claims. *Id.* at *1–3. The plaintiff then brought an action for breach of contract against the defendant. *Id.* at *3. Relying on provisions in the assignment of claims in which the plaintiff authorized its lender to act in its name as its "attorney-in-fact," the plaintiff argued that the lender merely possessed the right to enforce the plaintiff's rights in a lawsuit through a power of attorney. *Id.* at *5. The court rejected this argument, reasoning that the plaintiff "ha[d] no rights . . . relevant to th[e] action" because it completely assigned its claims. *Id. SolarReserve* establishes that a grant of a power of attorney cannot overcome a valid and complete assignment of claims for purposes of determining the real party in interest. LivaNova is correct that "the granting of a power-of-attorney is not equivalent to an assignment of claims," Def.'s Mem. in Supp. at 10, and *SolarReserve* suggests that a grant of a power of attorney alone is not sufficient to make the recipient the real party in interest, *see infra* Part B, but *SolarReserve* does not establish that an assignment of claims is the exclusive means by which a party can be recognized as the real party in interest.

B

Having rejected LivaNova's contention that an express assignment of claims is required, the next question is whether, under Delaware law, Mortier possesses contractual authority to sue on behalf of Caisson's former members and option holders. The source of Mortier's authority are the "Member Representative" provisions of the Unit Purchase Agreement and unit option termination agreements. LivaNova argues that, although these agreements authorize Mortier to be a single point of contact for Caisson's former members and option holders and to take a variety of actions, they do not allow Mortier to *commence*

14

litigation to enforce the rights of Caisson's former members and option holders.  Def.'s Mem. in Supp. at 11–12.  Mortier counters that the plain language of the agreements provides him with broad authority, including a substantive right to pursue claims on behalf of those individuals, and that LivaNova reads a limitation on Mortier's authority into the agreements that does not exist.  Pl.'s Mem. in Opp'n at 5–13.

"Under Delaware law, the interpretation of contractual language . . . is a question of law."  *O'Brian v. Progressive N. Ins. Co.*, 785 A.2d 281, 286 (Del. 2001).  Delaware courts apply an "'objective' theory of contracts"; in other words, "a contract's construction should be that which would be understood by an objective, reasonable third party."  *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (citation omitted).  Delaware law requires the court to look first to the plain language of a contract to determine the parties' intent.  *Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 846 (Del. 2019).  The court reads the contract "as a whole" and "give[s] each provision and term effect, so as not to render any part of the contract mere surplusage."  *Osborn*, 991 A.2d at 1159.  If the contract is "clear and unambiguous," the court "will give effect to the plain-meaning of the contract's terms and provisions, without resort to extrinsic evidence."  *Sunline Com. Carriers*, 206 A.3d at 846 (citation and internal quotation marks omitted).  "On the contrary, when [the court] may reasonably ascribe multiple and different interpretations to a contract, [it] will find that the contract is ambiguous" and look to extrinsic evidence to determine the parties' intent.  *Osborn*, 991 A.2d at 1160; *Sunline Com. Carriers*, 206 A.3d at 847.  "The parties' steadfast disagreement over interpretation will not, alone, render the contract ambiguous."  *Osborn*, 991 A.2d at 1160.

15

The plain language of the Unit Purchase Agreement unambiguously supports Mortier's reading.  Under Section 9.1, Mortier's authority and discretion are described in broad terms.  Each of Caisson's now-former members "irrevocably" appointed Mortier as his or her "true and lawful attorney-in-fact and agent, with full power of substitution or re-substitution" to act on his or her behalf "in *any* litigation or arbitration" involving the Unit Purchase Agreement and escrow agreement, "to do or refrain from doing *all* such further acts and things, and to execute *all* such documents as [Mortier] shall deem necessary and appropriate in connection with the transactions contemplated . . . ."  Unit Purchase Agreement § 9.1 (emphasis added).  The Unit Purchase Agreement specifically gives Mortier the authority "to transact matters of litigation related to this Agreement," to engage and rely on counsel, and "to do or refrain from doing any further act or deed on behalf of" the members that he "deems necessary or appropriate in his sole discretion relating to the subject matter of this Agreement as fully and completely as such Member could do if personally present."  *Id.*  Mortier's scope of authority is the same with respect to Caisson's former option holders, as expressly provided in the unit option termination agreements.  *See* Def.'s Mem. in Supp., Ex. B.  Nothing in the express language of this section reasonably indicates that Mortier's authority to transact litigation does not include the ability to commence a lawsuit.

The surrounding provisions of the Unit Purchase Agreement confirm this understanding.  Section 9.2 provides that the members will indemnify the Member Representative "for any and all liabilities, obligations, losses, Losses, penalties, actions, judgments, suits, costs, [and] expenses (including attorney's fees and expenses) . . . which

16

may at any time be imposed on, incurred by or asserted against the Member Representative in any way relating to or arising out of this Agreement or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby *or the enforcement of any of the terms hereof or thereof*[.]"[10]  (Emphasis added).  Relatedly, § 11.9 of the agreement provides that "[i]f any action at law or in equity . . . is necessary to enforce or interpret the terms of this Agreement or any of the other agreements referenced herein, the prevailing Party shall be entitled to reasonable attorneys' fees, costs and necessary disbursements in addition to any other relief to which such Party may be entitled."  Read together, and absent any express limitation on the Member Representative's ability to bring suit, the inclusion of these terms demonstrates that the Parties contemplated that the Member Representative might seek to enforce the Parties' contracts.

LivaNova argues that even if Mortier has the contractual authority to commence litigation on behalf of Caisson's former members and option holders, he is not a real party in interest under Delaware law because his authority is based on a power of attorney that does not confer upon him any interest in the rights he seeks to enforce.  Def.'s Mem. in Supp. at 10; Reply Mem. at 3–7.  "As a general rule, a person who is an attorney-in-fact or

---

[10]     To this end, the Unit Purchase Agreement provided for an account in the amount of $500,000 to be used by the Member Representative (the "Member Representative Reserve") on behalf of the members "to satisfy the obligations of the Member Representative as set forth herein and to otherwise permit the Member Representative to perform its obligations to the Members as set forth in this Article IX."  Unit Purchase Agreement §§ 3.1(b), 9.1(d), 9.5.  At the hearing on LivaNova's motion, Mortier argued that the amount of the reserve would be excessive if Mortier was only authorized to perform administrative duties and could not commence litigation.

an agent solely for the purpose of bringing suit is viewed as a nominal rather than a real party in interest and will be required to litigate in the name of the principal rather than in the agent's own name."  6A Mary Kay Kane, *Federal Practice and Procedure* § 1553 (3d ed. Apr. 2021 Update).  Delaware courts have recognized that a person authorized to bring suit solely on the basis of a power of attorney is not a real party in interest. *SolarReserve*, 2020 WL 4251968, at *5 (citing *Laney v. Schneider Nat'l Carriers, Inc.*, No. 09-cv-389-TCK-FHM, 2011 WL 13096625, at *2 (N.D. Okla. Mar. 29, 2011) (collecting federal court cases)); *cf. Choi v. Kim*, 50 F.3d 244, 247 (3d Cir. 1995) (concluding suit captioned with the name of the principal "by and through" the name of the attorney-in-fact was brought by the real party in interest).  But "an agent who has an ownership interest in the subject matter of the suit (or a power coupled with an interest) . . . is a real party in interest."  6A Kane, *Federal Practice and Procedure* § 1553.

Here, Mortier's appointment as Member Representative under the Unit Purchase Agreement and unit option termination agreements imparts him with substantially broader authority than just the ability to bring suit as an agent or attorney-in-fact.  *See generally* Unit Purchase Agreement § 9.  Moreover, the Unit Purchase Agreement provides that "[t]he appointment of the Member Representative shall be deemed coupled with an interest and shall be irrevocable, and the Purchaser and any other Person may conclusively and absolutely rely, without inquiry, upon any action of the Member Representative in all matters referred to herein."  *Id.* § 9.1.  Accordingly, the Unit Purchase Agreement does not merely grant Mortier a power of attorney to exercise on behalf of Caisson's former

18

members and option holders.  It also vests him with an interest in the rights he seeks to enforce, the defining characteristic of a real party in interest.

The conclusion that Mortier can maintain this action as the real party in interest is supported by a number of Delaware cases arising in the context of stockholder actions, an apt analogue.  In those cases, a stockholder representative typically "is authorized to act on a group of stockholders' behalf as an attorney-in-fact for certain purposes delineated by the relevant agreement."  *Pryor v. IAC/InterActiveCorp*, No. 6884-CS, 2012 WL 2046827, at *4 (Del. Ch. June 7, 2012).  "The contractual appointment of a shareholder representative to bring certain actions makes that representative the real party in interest in those actions." *Fortis Advisors LLC v. Allergan W.C. Holding Inc.*, No. 2019-0159-MTZ, 2020 WL 2498068, at *3 (Del. Ch. May 14, 2020).  Accordingly, Delaware courts have regularly permitted representatives to sue in their own names on behalf of other stockholders and shareholders.  The authority delegated to representatives in the relevant agreements in those cases is not meaningfully different from that given to Mortier in the Unit Purchase Agreement and unit option termination agreements.  *See, e.g*, *id.* (denying defendant's request for an order requiring former stockholders to participate in discovery as real parties in interest because merger agreement appointed plaintiff to litigate in their stead as their "sole, exclusive, true and lawful agent, representative and attorney-in-fact . . . with respect to any and all matters relating to, arising out of, or in connection with" the agreement); *Ballenger v. Applied Digit. Sols., Inc.*, No. Civ.A. 19399, 2002 WL 749162, at *10 (Del. Ch. Apr. 24, 2002) (examining the scope of a stockholders' representative provision in the context of a joinder dispute); *see also, e.g.*, *S'holder Rep. Servs. LLC v. RSI Holdco, LLC*,

19

No. 2018-0517-KSJM, 2019 WL 2207452 (Del. Ch. May 22, 2019) (action commenced

by representative of stockholders and option holders for recovery of holdback amount);

*Haney v. Blackhawk Network Holdings, Inc.*, No. 10851-VCN, 2016 WL 769595 (Del. Ch.

Feb. 26, 2016) (action for breach of contract, fraudulent inducement, and other related

claims brought by plaintiff as representative of selling stockholders).[11]

C

LivaNova last argues that, even if Mortier is entitled to bring this action on behalf

of Caisson's former members and option holders, it must be made clear that those

individuals will be bound by any judgment in this case, either by adding them as parties or

issuing an order to that effect.[12]   Def.'s Mem. in Supp. at 15–18; Def.'s Reply Mem. at

1–2.   Satisfaction of the requirements of Rule 17 is sufficient to address LivaNova's

concerns about the preclusive effect of a judgment in this case because the function of Rule

---

[11]      In light of the conclusion that Mortier is a real party in interest by virtue of his appointment as Member Representative, it is unnecessary to address Mortier's alternative argument that he may sue in his own name as a real party in interest "without joining the person for whose benefit the action is brought" because he is "a party with whom or in whose name a contract has been made for another's benefit."  Fed. R. Civ. P. 17(a)(1)(F); Pl.'s Mem. in Opp'n at 15–17.

[12]      LivaNova also asserts that "litigation in the names of the proper parties . . . is important because most of the people Mortier purports to represent do not have claims against LivaNova, or at the very least are subject to defenses that Mortier himself may not be subject to" because option holders who were also employees signed severance agreements that contained a waiver and release of claims.  Def.'s Mem. in Supp. at 13. That assertion implicates a number of issues beyond the scope of this motion such as whether those individuals waived claims pertaining only to their employment or also claims arising from the acquisition agreements.  However, given that Mortier has authority under applicable substantive law to enforce the rights of Caisson's former members and option holders, there is no apparent reason why he could not litigate these issues on their behalf.

20

17 is "to protect the defendant against a subsequent action by the party actually entitled to recover, and to insure generally that the judgment will have its proper effect as res judicata." Fed. R. Civ. P. 17, advisory committee's note to 1966 amendment. The Unit Purchase Agreement also contains terms to this effect. Unit Purchase Agreement §§ 9.1 ("[T]he Purchaser and any other Person may conclusively and absolutely rely, without inquiry upon any action of the Member Representative in all matters referred to herein."), 9.2 (By their appointment of the Member Representative, the Members hereby confirm all that the Member Representative shall do or cause to be done by virtue of his appointment as the representative of the Members hereunder."), 9.4 ("The Purchaser shall be entitled to rely, and shall be fully protected in relying, upon any statements furnished to it by, and the actions of, the Member Representative."). Caisson's former members and option holders, as parties to the relevant agreements, are on notice that Mortier has been appointed to represent their interests and act on their behalf and have ratified all actions taken in his role as Member Representative. Any decision in this case will be binding on those individuals. *See, e.g., Ballenger*, 2002 WL 749162, at *10–11 (considering similar provisions in merger agreement appointing stockholders' representative and concluding that defendant "ha[d] no reason to fear inconsistent judgments" because a judgment against the stockholders' representative would bind all former stockholders and that stockholders would not "face prejudice[] because they chose to give this authority to the [representative] and will share on a *pro rata* basis in any recovery obtained in this case"); *Coughlan*, 2010 WL 1531596, at *3 & n.10 (stating the language in the agreement need not be exhaustive with respect to binding represented parties but rather sufficient to establish the authority of the

representative); *see also Naghiu v. Inter-Cont'l Hotels Grp., Inc.*, 165 F.R.D. 413, 421 (D. Del. 1996) (stating a "proper ratification" under Rule 17(a) requires the ratifying party to "authorize continuation of the action" and "agree to be bound by the lawsuit's result").  No further order is necessary.[13]

### ORDER

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS ORDERED** that Defendant's Motion for Judgment on the Pleadings or in the Alternative to Substitute Real Parties in Interest [ECF No. 26] is **DENIED**.


Dated:  June 14, 2021                          s/ Eric C. Tostrud
                                               Eric C. Tostrud
                                               United States District Court

---

[13]     To the extent that LivaNova seeks to add Caisson's former members and option holders as parties, such a request implicates a question of joinder under Rule 19, an issue not addressed in the Parties' submissions.