UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Todd J. Mortier, as Member Representative of the former Members of Caisson Interventional, LLC,

        Plaintiff,

v.

LivaNova USA, Inc.,

        Defendant.

File No. 19-cv-3140 (ECT/DTS)

**OPINION AND ORDER**

---

Elizabeth A. Patton, Fox Rothschild LLP, Minneapolis, MN; R. James Kravitz, Fox Rothschild LLP, Lawrenceville, NJ; and Dennis B. Johnson, Chestnut Cambronne PA, Minneapolis, MN, for Plaintiff Todd J. Mortier, as Member Representative of the former Members of Caisson Interventional, LLC.

Isaac B. Hall, Cb Baga, and Larry E. LaTarte, Faegre Drinker Biddle & Reath LLP, Minneapolis, MN; and Heather Carson Perkins, Faegre Drinker Biddle & Reath LLP, Denver, CO, for Defendant LivaNova USA, Inc.

---

In this diversity case, Plaintiff Todd J. Mortier, representing the members and option-holders of an LLC formed to develop a medical device, asserts breach-of-contract and quasi-contract claims under Delaware law against the LLC's business partner, LivaNova USA, Inc. The gist of Mortier's claims is that LivaNova breached express and implied contract terms that, Mortier says, required LivaNova to do more than it did to develop the medical device.

LivaNova has moved for summary judgment, and the motion will be granted. The relevant contract terms cannot reasonably be understood as Mortier advocates. Considered

against their correct interpretation, the record evidence Mortier identifies does not show a trial-worthy question concerning the contract's breach.  And the contract's detailed and reticulated nature forecloses Mortier's assertion of quasi-contract claims.

I

*The TMVR device.*  In early 2011, Mortier and his colleague Cyril J. Schweich, Jr. developed an idea for a less-invasive treatment for mitral valve disease, a heart condition which is otherwise primarily treated with open-heart surgery.  ECF No. 142 ¶ 2.  Mortier and Schweich's transcatheter mitral valve replacement (or "TMVR") system would treat mitral valve regurgitation with a small remote-controlled device.  ECF No. 114-15.  As designed, the remote-controlled TMVR device would be inserted into a patient's vein through an incision in the groin, from which it would travel to the patient's heart.  ECF No. 114-15.  Then, a doctor would use the remote control to land the device in the diseased valve opening and anchor it in place with the device's flared feet.  *Id.*; Compl. [ECF No. 1-1] ¶ 28.

*Mortier and Schweich present the TMVR device to LivaNova, and a new organization is formed to develop the device.*  Later that year, Mortier and Schweich presented their idea to LivaNova, a multi-national medical device company.[1]  ECF No. 146-5. By 2012, Mortier and Schweich had developed a TMVR design concept and filed a provisional patent application.  ECF No. 144-4 at 84–85, 105.  On July 4, 2012, they

---

[1]   Mortier and Schweich actually met with LivaNova's predecessor, Sorin Group.  LivaNova was formed when Sorin merged with Cyberonics, Inc.  Hereafter, "LivaNova" refers to the entire LivaNova organization.  *See* ECF No. 116-3; Compl. ¶¶ 12–14, 31.

2

executed a term sheet with LivaNova and created a new company, Caisson Interventional, LLC, to develop the TMVR system. *Id.* at 105.

*Caisson and LivaNova enter initial agreements regarding the TMVR device's development.* On September 14, 2012, Caisson and LivaNova inked two agreements. First, the two companies agreed that LivaNova would fund Caisson in set amounts in exchange for equity, as development and regulatory approval of the TMVR device met certain milestones. ECF No. 116-3. On the same day, Caisson, Mortier, Schweich, and LivaNova entered an Option Agreement, which provided LivaNova with the option to purchase the remaining equity in Caisson upon the achievement of a CE Mark.[2] ECF No. 116-4. Over the next four years, Caisson met a number of milestones, and LivaNova provided funds in accordance with the agreement. Compl. ¶¶ 46–52.

*LivaNova acquires Caisson's remaining equity, and the Parties assent to the at-issue contract.* Although Caisson had not yet acquired a CE Mark for the TMVR system, in September 2016 the parties agreed that LivaNova would acquire the remaining Caisson equity. At this point, LivaNova had invested $23 million in Caisson and owned 49.1% of its stock. ECF No. 104-1 ¶ 107. On May 2, 2017, LivaNova purchased the remaining equity in Caisson, and the parties memorialized the purchase and related obligations in a Unit Purchase Agreement ("UPA"). ECF No. 143-1. The UPA provided that LivaNova would pay up to $72 million for Caisson, in addition to $18 million in employee retention payments. *Id.* § 3.1. As with the parties' previous agreements, the purchase price included

---

[2]    To be sold in the European Union, a medical device must obtain a CE (Conformitè Europëene) Mark, which specifies that a product conforms to the European Norms or standards and the European Medical Device Regulations. ECF No. 104-1.

3

several "milestone" payments contingent on Caisson's device accomplishing regulatory approvals, including payments to members and option-holders of $9 million after CE Mark approval, $9 million after premarket authorization ("PMA") by the United States Food and Drug Administration ("FDA"),[3] and twenty percent of the net sales of covered products worldwide until the earlier of: 1) payments totaled $21,600,000, or 2) ten years from the date of the first commercial sale ("the earn-out payments"). *Id.* LivaNova has paid the members and option-holders of Caisson more than $32 million under this section but has not paid the remaining $39.6 million for CE Mark approval, PMA, and earn-out payments. Compl. ¶¶ 67-73; Answer [ECF No. 9] ¶¶ 67-73.

*The UPA's especially relevant provisions.* As relevant for this litigation, the UPA contains two provisions that ostensibly set forth LivaNova's obligations following its purchase of Caisson. First, Section 4.3 of the agreement described the efforts LivaNova agreed to undertake to facilitate the milestone payments described above. Second, Section 7.13 guaranteed essentially that LivaNova had adequate financial resources to satisfy its obligations under the agreement. The UPA limited all representations and warranties of LivaNova and its members to twenty-four months from the effective date of the agreement, unless otherwise provided. ECF No. 143-1 § 8.7.

*The Caisson team's 2017 and 2018 operations.* After executing the UPA, the Caisson team continued work on the TMVR device while operating independently within LivaNova. ECF No. 144-1 at 62–63. Throughout 2017 and 2018, LivaNova staffed and

---

[3]  The FDA requires pre-market approval for high-risk medical devices sold in the United States. ECF No. 104-1 ¶ 91. A clinical trial involving human subjects is usually required to gather data demonstrating safety and effectiveness. *Id.*

4

funded the Caisson team at lower levels than it had originally budgeted. For example, LivaNova hired fifteen fewer employees for the Caisson team than originally budgeted in 2017, and twelve fewer in 2018. ECF No. 144-10 at 96–97; ECF No. 147. Further, the Caisson team's funding was approximately $5 million below the original budget in 2017 and was $4.479 million less than originally budgeted in 2018. ECF No. 147-3; ECF No. 144-10 at 100.

*Patient deaths occur in TMVR clinical trials and are investigated.* In the fall of 2018, two patients died in clinical trials of the TMVR device, with a third experiencing serious adverse effects. As a result, the team paused the clinical trial and notified the FDA of the halt. ECF No. 119-5. A root-cause analysis determined that the injury and deaths were caused by the device's anchor system. ECF No. 119-3. The Caisson team determined that the device required redesign. ECF No. 114-17. The investigation also found related issues in seven other patients who had previously been treated with the device. ECF No. 114-9.

*A redesign of the TMVR device posed financial and other challenges.* A product redesign, however, would have required LivaNova to invest significant additional money into Caisson, estimated at more than $200 million, and would have delayed the product's milestones by two to three years. ECF No. 116-11. In the meantime, the CE Mark standard was changing, and any redesigned device would require a 300-patient trial, up from the 50-patient trial required when the UPA was executed. *See* ECF No. 114-12; ECF No. 116-1. A more comprehensive clinical trial would take longer, further delaying the device's authorization, would cost significantly more money, and raised the possibility that

5

the TMVR would not be the first device of its type to market and would thereby lose competitive advantage.  ECF No. 119 ¶¶ 92–94; ECF No. 116-1; ECF No. 114-8 at 71–72.

*A competing device shows promise.*  At the same time, a clinical study ("the COAPT Study") of the efficacy of a competitor's mitral valve repair system, the MitraClip device, was published in September 2018, and showed that this device was effective to treat moderate-to-severe mitral valve regurgitation.  ECF No. 114-2 at 133–36; ECF No. 144-7 at 52–54.  This study was significant because clip devices had been previously used only for mild-to-moderate valve regurgitation, and an effective clip device represented a much less invasive treatment for more serious conditions than the TMVR device.  ECF No. 114-1 at 60; *see also* ECF No. 112-1 (Morgan Stanley report titled, "COAPT Is a Game Changer").

*LivaNova revises the Caisson business plan.*  The LivaNova business team revised Caisson's business plan to account for these changed conditions in early 2019.  ECF No. 116-10.  LivaNova also conducted a decision-tree analysis in February 2019 highlighting some of these issues, while nevertheless noting Caisson's potential for value creation if provided further investment.  ECF No. 148-7.

*LivaNova faces business and financial challenges.*  Meanwhile, in early 2019, LivaNova was experiencing financial difficulties.  LivaNova settled a multi-jurisdiction lawsuit involving another of its products that resulted in approximately $300 million in costs.  ECF No. 144-9 at 100–01; ECF No. 148.  LivaNova subsequently secured a $350 million loan with the European Investment Bank.  ECF No. 144-10 at 76–78.  LivaNova

also missed its revenue and earnings targets in the first quarter of 2019, resulting from earnings issues with one of its main businesses. *Id.* at 78–79.

*LivaNova looks to sell Caisson but is unsuccessful.* In April 2019, the LivaNova Board authorized the sale of Caisson and retained Goldman Sachs to attempt to find a buyer for the business. ECF No. 114-13. Goldman Sachs approached multiple potential buyers but received no offers to buy Caisson. ECF No. 116-13. Goldman Sachs concluded that it had exhausted its prospects in early fall 2019. ECF No. 114-1 at 282–83.

*LivaNova opts not to move forward with the TMVR device.* On November 14, 2019, the LivaNova Board of Directors voted to stop investing in development of the Caisson TMVR device. ECF No. 120-2. Each Caisson employee had the option to receive a severance payment in exchange for a broad release of claims as part of an employee termination agreement. ECF No. 120-5. Mortier and Schweich, who had been terminated in February 2019, also signed an agreement and release, though the language of their agreements differs from that of the other former Caisson employees by expressly exempting claims under the UPA. ECF No. 33-1 ¶ D.

*Mortier files this case.* On November 25, 2019, Mortier filed this lawsuit on behalf of former members and option holders of Caisson. Compl. ¶ 9. He alleges that LivaNova breached its obligations under the UPA to pursue product development, clinical trials, and regulatory approval for Caisson's TMVR system. Compl. ¶ 1. Further, he contends that LivaNova breached the covenant of good faith and fair dealing, and that LivaNova was unjustly enriched. Compl. ¶¶ 127, 136.

7

*LivaNova seeks summary judgment.* LivaNova argues 1) Mortier's breach of contract claim fails on the plain language of the UPA; 2) even if LivaNova breached the UPA, Mortier's damages are unsupported, barred, and limited by the agreement itself; 3) Mortier's claim that LivaNova breached the covenant of good faith and fair dealing is duplicative of, and fails for the same reasons as, his contract claim; and 4) Mortier's unjust-enrichment claim is duplicative of his contract claim. ECF No. 110 at 1–3. LivaNova also argues that Mortier cannot recoup damages for all former Caisson members because many of those members released their claims against LivaNova in their severance agreements. *Id.* at 27–28. Mortier contends that summary judgment should be denied, arguing there are genuine issues of material fact as to whether LivaNova breached Sections 4.3 and 7.13 of the UPA, whether Mortier has recoverable damages, and whether LivaNova breached the implied covenant of good faith and fair dealing. ECF No. 140 at 1.

II

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

A

Begin with Mortier's breach-of-contract claim. Delaware law controls the interpretation and application of the UPA. ECF No. 143-1 § 11.4. To establish a claim for breach of contract under Delaware law, a plaintiff must prove three elements: 1) formation of a contract, 2) breach of an obligation imposed by that contract, and 3) resultant damage to the plaintiff. *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003). In Delaware, the meaning of a contract provision is resolved through a two-step process. First, the trial court must make a threshold legal determination of whether the contract provision is ambiguous. *GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776 (Del. 2012). Second, if the contract is deemed ambiguous, the factfinder then assesses admissible extrinsic evidence to resolve the ambiguity. *Id.* In those instances, summary judgment is not appropriate. *See TIBCO Software, Inc. v. nThrive Revenue Sys., LLC*, No. CV N18C-08-072 MAA, 2019 WL 6216229 (Del. Super. Ct. Nov. 21, 2019). If the contract provision is not ambiguous, its construction and interpretation is a matter of law. *Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996).

1

Mortier's first contention is that a trial-worthy issue exists as to whether LivaNova breached Section 4.3 of the UPA. This section provides:

> **Section 4.3** <u>Purchaser and Company Efforts.</u> Purchaser shall, and shall cause the Company to, undertake such efforts and use such level of care to obtain or achieve, and make business decisions related to obtaining, achieving, (a) the CE Mark Achievement and (b) PMA, as are consistent with the efforts and level of care and business decisions Purchaser and its

> affiliates employ generally in the process of seeking, prosecuting and eventually obtaining product regulatory approvals worldwide from time to time, including considerations with regard to the cost/benefit, internal rate of return and return on investment of such business decisions. Purchaser shall also, and shall also cause the Company to, undertake such efforts and business decisions with respect to sales of Covered Products, which are subject to the Earn-Out Payments as are consistent with the efforts and level of care and business decisions Purchaser and its affiliates employ generally in their business from time to time.

ECF No. 143-1 § 4.3.

The first question is whether this section is ambiguous. LivaNova interprets this provision as allowing it to employ its usual business efforts and care in making business decisions in the pursuit of regulatory approval and commercialization, considering both the costs and benefits of those decisions. LivaNova argues that the provision allowed it to operate the business as it saw fit. *See Schneider Nat'l Carriers, Inc. v. Kuntz*, C.A. No. 2017-0711-PAF, 2020 WL 4012284, at *5 (Del. Ch. July 16, 2020). Mortier places particular emphasis on the word "consistent," interpreting it as a requirement that LivaNova treat Caisson consistently with its other projects, including all comparable SPIs,[4]

---

[4] LivaNova categorizes the medical devices it invests in as Strategic Portfolio Initiatives ("SPIs"). LivaNova had four similar SPIs in various stages of development at approximately the same time as the TMVR. ECF No. 146-4. LivaNova's other SPIs also experienced challenges during this period: one product experienced delays, including a clinical trial pause, and required a second generation device, ECF No. 149-17; another experienced a projected shortfall of $1.9 million, and had to change branding of a device due to regulatory concerns, ECF No. 150-5; and still another experienced issues with reimbursements from the Centers for Medicare and Medicaid Services, limiting its availability to patients, ECF No. 144 at 148–149. The fourth device experienced delays in achieving PMA and in recruiting patients. ECF No. 150-8; ECF No. 150-9.

10

in its processes and outcomes. This is the crux of the parties' disagreement: what burden does the word "consistent" place on LivaNova?

While the parties disagree as to the meaning of Section 4.3, this does not necessarily mean the section is ambiguous. "A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction." *GMG Cap. Invs., LLC*, 36 A.3d at 780 (citation omitted). Further, "[c]ourts will not torture contractual terms to impart ambiguity where ordinary meaning leaves no room for uncertainty." *Rhone-Poulenc Basic Chemicals Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992). Rather, to be considered ambiguous, the provisions must be "fairly susceptible of different interpretations or may have two or more different meanings." *Id.* Neither party has identified any cases assessing contract language resembling that in Section 4.3.

The language of Section 4.3 is not ambiguous in the respect Mortier contends it is. Section 4.3 allowed LivaNova to exercise its usual effort, level of care, and business decisions, so long as that was consistent with its general practice. Contrary to Mortier's argument, the section does not require that LivaNova provide its projects with equal outcomes. That the phrases "usual business judgment" or "usual business efforts" are not included in the provision does not mean that LivaNova was not free to operate its business as it saw fit. *See Schneider Nat'l Carriers, Inc.*, 2020 WL 4012284, at *5.

The parties agreed that LivaNova would make efforts and employ a level of care consistent with the efforts LivaNova generally employs in the regulatory process. They agreed that in making business decisions, LivaNova would do so consistently with the business decisions it generally makes throughout the regulatory process. None of these

11

agreements required that LivaNova provide the same outcomes to all of its projects or provide a commensurate budget to each project. Nor did they make LivaNova a guarantor of the TMVR device's regulatory approval.

To the contrary, Section 4.3 itself provided that LivaNova would consider "cost/benefit, internal rate of return and return on investment" when making its business decisions, rather than merely basing its decisions on equal outcomes among its projects. Interpreting the word "consistent" to require that LivaNova provide equal outcomes to its SPIs, regardless of the applicable factors involved, would override LivaNova's ability to consider costs, benefits, internal rate of return, and return on investment when coming to a business decision. "In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein." *E.I. du Pont de Nemours & Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985). Section 4.3 is not therefore fairly susceptible of different interpretations, nor does it have two or more different meanings. Its construction requires no jury trial. *Vanderbilt Income & Growth Assocs., L.L.C.*, 691 A.2d at 613.

The parties dispute whether Mortier has established a genuine issue of material fact as to LivaNova's compliance with Section 4.3 of the UPA. *See* Fed. R. Civ. P. 56(a). To demonstrate its compliance with that section of the contract, LivaNova outlined the factors it considered in the process of deciding to halt its investment in the TMVR device. As required in Section 4.3, LivaNova considered the cost of continued investment for the TMVR device in the wake of a delayed timeline, greater expense, a new competitive landscape, changes to the CE Mark standard, and a heightened risk profile. Mortier, in

turn, identifies no disputed issue of material fact showing that LivaNova failed to undertake the efforts and level of care necessary to be consistent with the efforts and level of care LivaNova generally employs in seeking regulatory approval for its SPIs. While he identifies outcomes and business decisions he disagrees with, Mortier fails to demonstrate a fact issue as to the process LivaNova used or the factors it considered in making its business decision to stop funding Caisson.

First, Mortier points to the COAPT results, arguing that because some within LivaNova believed the results were a positive development, LivaNova's statement that the COAPT results negatively impacted its view of the TMVR project is a disputed fact. But a belief by some in the organization that the COAPT results were positive has no bearing on whether LivaNova acted consistently "with the efforts and level of care and business decisions" it generally employed. ECF No. 143-1 § 4.3. In other words, Mortier has identified no record evidence from which a reasonable juror might infer that internal differences of opinion were outside the norm for LivaNova or that dissent had to be followed or ordinarily resulted in decisions materially different from those challenged here.

Second, Mortier asserts that because patient deaths are expected in the development of heart-related medical devices, any claim that LivaNova considered this in its decision to shut down Caisson is inconsistent with its treatment of other SPIs. To illustrate this, Mortier explains that two other SPIs experienced patient deaths within their clinical trials. While Mortier draws a similarity between Caisson and these SPIs, he offers no evidence that LivaNova failed to consider patient deaths when evaluating these projects. Showing

13

that deaths occurred in other SPIs' clinical trials but did not result in shutdowns of those SPIs shows different outcomes, not inconsistent efforts or considerations.

Mortier argues that LivaNova's consideration of Caisson's inability to be first to market with the TMVR device was not an exercise of "usual business judgment" because LivaNova's goal was in fact to be the "best" in TMVR, not first to market. Yet, nothing in Section 4.3 prevents LivaNova from considering the increased costs involved with being beaten to market by a competitor. Section 4.3 explicitly authorizes a cost analysis such as this. ECF No. 143-1 § 4.3.

Mortier also takes issue with LivaNova's attempted sale of Caisson. Mortier claims that the attempted sale was inconsistent with the exercise of LivaNova's usual business judgment because the sales process was shorter than the sales process for other SPIs. Further, he characterizes the Goldman Sachs team that was hired to sell Caisson as "inexperienced bankers," citing the assessment of LivaNova executive Ed Andrle. But Mr. Andrle was not involved with Goldman Sachs's hiring and was not involved in their efforts, and thus his assessment of the team is irrelevant because it is not accompanied by any indication that LivaNova's use of Goldman Sachs was inconsistent with LivaNova's general practices. ECF No. 140 at 23.[5]

Finally, Mortier argues that LivaNova's budgeting and resource decisions demonstrate inconsistent treatment of Caisson when compared to other SPIs. Section 4.3

---

[5]   Only justifiable inferences are to be drawn in the plaintiff's favor, not those that are based on "mere speculation." *See Liberty Lobby*, 477 U.S. at 248; *Williams v. Mannis*, 889 F.3d 926, 931 (8th Cir. 2018). On this record, whether a more experienced Goldman Sachs team or other decisions would have changed anything and yielded Caisson's sale (for a price Mortier might agree was reasonable) seems speculative.

does not require that LivaNova provide consistent budgeting or outcomes across its SPIs, however. The agreement instead required LivaNova to exercise its usual effort, level of care, and business decisions, so long as that was consistent with its general practice. ECF No. 143-1 § 4.3. Mortier does not show that LivaNova undertook a process that was inconsistent with its general practice when it made its budget and resource allocations to Caisson.

To summarize, Mortier has failed to show that LivaNova did not consider a changed market, greater cost, patient deaths, delayed time to market, or its other cited factors when making business decisions about other SPIs, or that it considered these (or other) factors in ways that were inconsistent with LivaNova's ordinary business decisionmaking. Mortier thus has failed to identify any material facts whose resolution would affect the outcome of this suit under the governing law, *see Liberty Lobby*, 477 U.S. at 248, making summary judgment appropriate in LivaNova's favor as to Mortier's Section 4.3 breach-of-contract claim.

2

Although not raised specifically in the complaint, Mortier now contends that LivaNova also breached Section 7.13 of the UPA by failing to provide Caisson with sufficient financial resources. This section, found in the "Representation and Warranties of Purchaser" section of the contract, provides:

> **Section 7.13** Adequacy of Funds; Solvency. Purchaser has adequate financial resources and cash to satisfy its monetary and other obligations under this Agreement. After giving effect to the transactions contemplated by this Agreement and assuming the truth and accuracy in all material respects of the representations and warranties of the Company under this

15

> Agreement, on a consolidated basis (a) the fair value of the properties of Purchaser will exceed its debts and liabilities, subordinated, contingent or otherwise; (b) the present fair saleable value of the Purchaser's property will be greater than the amount that will be required to pay the probable liability of its debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured; (c) Purchaser will be able to pay its debts and liabilities, subordinated, contingent, or otherwise, as such debts and liabilities become absolute and matured; and (d) Purchaser will not have unreasonably small capital with which to conduct the business in which it is engaged as such business is now conducted and is proposed to be conducted following the consummation of the transactions contemplated hereby.

ECF No. 143-1 § 7.13.

According to Mortier, because the Agreement extends all representations and warranties to twenty-four months from the effective date of the agreement, *id.* § 8.7, LivaNova violated the UPA by giving the Caisson project what Mortier believes was insufficient funding and support. Specifically, Mortier complains that Caisson was forced to "compete for resources with other LivaNova SPIs" and LivaNova spent "less on Caisson than originally budgeted in 2017, 2018, and 2019." ECF No. 140 at 48–49. In short, Mortier contends that Section 7.13 required LivaNova to provide Caisson with all of the funds Caisson believed it needed, regardless of LivaNova's other obligations or other business considerations.

Mortier's interpretation of Section 7.13's requirements is unreasonable. A representation that a company is sufficiently capitalized for purposes of a sale does not create funding obligations going forward. If this section's representations were understood to create future-funding obligations on LivaNova's part, those obligations did not require LivaNova to fund Caisson up to Caisson's expectations. Rather, LivaNova promised only

16

that it was a solvent, going concern, and that it would have sufficient capital to operate as such even after the purchase of Caisson's business. There is no dispute that LivaNova complied with these representations—indeed, LivaNova remains a solvent company today—and Mortier's claim for breach of contract arising out of Section 7.13 fails.

B

LivaNova seeks summary judgment on Mortier's quasi-contract claims. Start with Mortier's claim for a violation of the implied covenant of good faith and fair dealing, which under Delaware law is a "limited and extraordinary legal remedy." *Nemec v. Shrader*, 991 A.2d 1120, 1128 (Del. 2010). There is no dispute that this "implied covenant cannot be invoked to override the express terms of the contract." *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009). "[T]he implied covenant does not apply when the contract addresses the conduct at issue, but only when the contract is truly silent concerning the matter at hand." *Oxbow Carbon & Mins. Holdings, Inc. v. Crestview-Oxbow Acquisition, LLC*, 202 A.3d 482, 507 (Del. 2019) (quotations omitted). To successfully make out a claim for a violation of the implied covenant, Mortier "must allege a specific implied contractual obligation and allege how the violation of that obligation denied the plaintiff the fruits of the contract." *Kuroda*, 971 A.2d at 888.

According to Mortier, the UPA contains "multiple implied contractual obligations." ECF No. 140 at 61. These obligations include a promise to "not arbitrarily and unreasonably interfere with[] developing the TMVR system to become #1 in TMVR," a promise to fund development of the TMVR system, and that LivaNova would "return Caisson, the TMVR system, and the corresponding intellectual property rights to Caisson's

17

former members" if LivaNova ultimately determined that it could not continue to fund Caisson. *Id.*

The UPA is a highly detailed, reticulated contract that does not mention any of these obligations. "The implied covenant of good faith and fair dealing should not be applied to give plaintiffs contractual protections that they failed to secure for themselves at the bargaining table." *Winshall v. Viacom Int'l, Inc.*, 55 A.3d 629, 636–37 (Del. Ch. 2011) (quotation omitted). Mortier has failed to identify record evidence to support an inference that the parties' agreement contained the implied covenants he asserts. LivaNova is entitled to summary judgment on Mortier's claim for a breach of the implied covenant of good faith and fair dealing.

Mortier's claim for unjust enrichment fails for a similar reason. "A claim for unjust enrichment is not available if there is a contract that governs the relationship between parties that gives rise to the unjust enrichment claim." *Kuroda*, 971 A.2d at 891. Mortier's complaint claims that there is "an express, enforceable contract that controls the parties' relationship," and thus his claim "for unjust enrichment [must] be dismissed." *Bakerman v. Sidney Frank Imp. Co.*, ___ F. Supp. 3d ___, No. Civ.A. 1844-N, 2006 WL 3927242, at *18 (Del. Ch. Oct. 10, 2006) (revised Oct. 16, 2006).[6]

---

[6] Because LivaNova is entitled to summary judgment on Mortier's contract and quasi-contract claims, it is not necessary to address whether some members released their claims or whether the UPA limits Mortier's damages. Further, because Mortier's claims fail on the merits, it is unnecessary to address the parties' motions to exclude expert testimony. *See Lewis v. City of Burnsville*, No. 19-CV-1117, 2021 WL 5449286, at *1 (D. Minn. Nov. 22, 2021). Those motions will be denied as moot.

18

**ORDER**

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS ORDERED** that:

1. Defendant's Motion for Summary Judgment [ECF No. 108] is **GRANTED**.

2. Plaintiffs' Motion to Exclude Expert Testimony of Martin C. Burke [ECF No. 59] is **DENIED as moot**.

3. Plaintiff's Motion to Exclude Expert Testimony of Matthew Grennan [ECF No. 70] is **DENIED as moot**.

4. Defendant's Motion to Exclude Expert Testimony of Todd Mortier and Cyril J. Schweich Jr. [ECF No. 82] is **DENIED as moot**.

5. Defendant's Motion to Exclude Expert Testimony of Ramji Iyer [ECF No. 90] is **DENIED as moot**.

6. Defendant's Motion to Exclude Expert Testimony of Peter Crosby [ECF No. 99] is **DENIED as moot**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  May 12, 2022

s/ Eric C. Tostrud
Eric C. Tostrud
United States District Court